527 S.E.2d 516

**Joe BAILEY, et al., Plaintiffs Below, Appellees,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant Below, Appellant.**

**Eddie S. Caldwell, et al., Plaintiffs Below, Appellees,**

v.

**Norfolk and Western Railway Company, Defendant Below, Appellant.**

No. 26004.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 19, 1999.

Decided Dec. 15, 1999.

Concurring and Dissenting Opinion of Justice Maynard Dec. 17, 1999.

William Flanigan, Esquire, Lane O. Austin, Esquire, Sanders, Austin, Swope & Flanigan, Princeton, West Virginia, Attorneys for the Appellees, Bailey and Caldwell, et al.

Jeffrey S. Berlin, Esquire, Mark E. Martin, Esquire, Sidley & Austin, Washington, D.C., and Wade T. Watson, Esquire, Brumfield & Watson, Bluefield, West Virginia, and

Mark D. Perreault, Esquire, Norfolk, Virginia, Attorneys for the Appellant.

McGRAW, Justice:

This is an appeal by Norfolk and Western Railway Company (hereinafter "the Railroad" or "Appellant")[1] from a jury verdict in the Circuit Court of McDowell County finding that the Railroad had discriminated against sixty-seven employees upon the basis of age when it promoted those employees from brakemen to conductor and placed them at the bottom of the conductors' seniority roster. On appeal, the Railroad maintains that there was insufficient evidence to prove age discrimination and that the jury verdict should be overturned. We disagree and affirm the decision of the lower court.

## I.

## FACTS

The two cases presently consolidated for review in this Court originated in the lower court and were subsequently removed by the Railroad to the United States District Court for the Southern District of West Virginia. The Railroad sought a ruling in federal court permitting removal and dismissing the action based upon federal preemption by the Railway Labor Act, 45 U.S.C. § 151–188 (1990). The District Court determined that it lacked jurisdiction and remanded the cases to state court, reasoning as follows: "If Plaintiffs' assertions in their Complaint are well-founded, this right [under the West Virginia Human Rights Act] exists separate and apart from any collective bargaining agreement between the defendant and the Plaintiffs' union." *Bailey v. Norfolk and Western Railway Co.*, 842 F.Supp. 218, 223 (S.D.W.Va. 1994).

Upon remand from federal court to the Circuit Court of McDowell County, the two cases were consolidated and issues of liability and damages were bifurcated for trial. Fifty-two Plaintiffs filed their actions within the

*Bailey* lawsuit, and the additional fifteen filed identical claims in the *Caldwell* suit. Forty-one Plaintiffs are currently active employees of the Railroad; the remaining twenty-six have retired, resigned, or have become disabled. Five of the Plaintiffs in this action were under forty years of age at the time of their alleged discriminatory placement, effective April 1, 1992. Although the Plaintiffs claim that they were targeted based upon their association with the protected group, the Railroad contends that the lower court erred by allowing the verdict to stand as to these five Plaintiffs.

The essence of the Plaintiffs' complaint is that the Railroad implemented its policies and procedures in such manner as to discriminate against "a large class of older and age-protected workers, who had far greater trainmen seniority than workers hired after November 1, 1985...." These workers were "placed on the bottom of the conductor list...." The Plaintiffs alleged that this action by the Railroad violated West Virginia Code § 5–11–9(1) (1999), the West Virginia Human Rights Act, providing in pertinent part as follows:

> It shall be an unlawful discriminatory practice ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or disabled: Provided, That it shall not be an unlawful discriminatory practice for an employer to observe the provisions of any bona fide pension, retirement, group or employee insurance or welfare benefit plan or system not adopted as a subterfuge to evade the provisions of this subdivision[.]

The Plaintiffs allege that the Railroad engaged in a purposeful venture to eliminate workers who maintained expensive benefit packages earned and vested by employees hired before November 1, 1985, in favor of a class of workers whose membership is com-

---

**1.** The Appellant, Norfolk and Western Railway Company, was the corporate predecessor of Norfolk Southern Railway Company. When the events which form the basis for this cause of action occurred, Norfolk and Western was a sep-

arate Railroad, whose parent company was Norfolk Southern. In September 1998, Norfolk and Western was merged into Norfolk Southern and no longer exists as a separate corporate entity.

prised of workers predominantly younger than the Plaintiffs and whose benefit packages are less expensive for the Railroad. The Plaintiffs' rights, they contend, are grounded in state law and do not present a federal question involving violations of collective bargaining agreements.

The Plaintiffs presented evidence at trial indicating an extensive, intentional campaign by the Railroad during the early 1980's designed to reduce the workforce and directed primarily at the older workers who enjoyed the expensive benefit packages.[2] The alleged targets of this strategy were brakemen who had the right under collective bargaining agreements to refuse promotion to conductor, thereby retaining their seniority rights and benefits packages as brakemen.

Through a collective bargaining agreement dated October 1, 1985, the Railroad achieved the right to force-promote all employees hired after November 1, 1985, from brakemen to conductor.[3] Under the terms of a 1988 labor agreement negotiated to govern conductor seniority for post–1985 employees, a post–1985 employee's conductor seniority was to be established by reference to his ranking on the brakemen roster, thereby allowing him to effectively transfer his brakemen seniority to the conductor roster. The 1988 collective bargaining agreement did not address the conductor seniority rights of the pre–1985 employees since they had not yet been subjected to force-promotion.

Subsequent to achieving the right to force-promote the post–1985 employees, the new target of the Railroad's elimination policies, according to the Plaintiffs, became the senior brakemen hired prior to November 1, 1985, who still possessed the right to refuse promotion to conductor. This group allegedly consisted of approximately 130 brakemen on the Pocahontas Division of the Railroad, 87 percent of whom were over the age of forty.

In a new round of national bargaining beginning in 1988, the Railroad sought to achieve the right to force-promote the pre–1985 employees to conductor. Subsequent to two years of unsuccessful bargaining, the President of the United States created Presidential Emergency Board No. 219 (hereinafter "PEB 219") to investigate the unresolved disputes.[4] In 1991, PEB 219 acceded to the Railroad's position and awarded carriers the right to force-promote the brakemen to conductor. By report dated January 15, 1991, the PEB stated that "[i]t is the Board's view, and it so recommends, that all brakemen who are offered promotion to conductor should be required to accept such promotion."

In response to the PEB decision, the United Transportation Union (hereinafter "UTU") and seven other unions initiated a nationwide rail strike. Congress intervened by enacting Public Law No. 102–29, 105 Stat. 69 (1991) which made the report of PEB 219 binding on the Railroads and unions except as might be clarified or modified by a "Special Board" established by the statute. During these Special Board proceedings, the UTU argued that the force-promotion would result in inequitable placement of senior brakemen at the bottom of the conductor seniority roster, below employees who were more junior as brakemen but who were already conductors. The Railroads responded by assuring the UTU that if "UTU wants brakemen seniority dates to be used for purposes of conductors' seniority, the carriers have no objection; the matter can be resolved when implementing language is adopted." Based upon those proceedings, the Special Board thereafter found PEB 219

---

2. The benefit packages apparently included significant monetary benefits, higher salaries, and job security rights based upon years of service and seniority within the brakemen category.

3. This agreement provided that trainmen who established seniority prior to November 1, 1985, including the Plaintiffs in this case, would be governed by existing rules respecting promotion to conductor. The agreement further provided that those establishing seniority on or after November 1, 1985, must accept promotion to conductor. These new hires were promoted after

300 working days to the rank of conductor and could not relinquish or forego their conductor rights or refuse promotion.

4. Under the Railway Labor Act, 45 U.S.C. §§ 155–56, Railroads and unions periodically engage in negotiations to modify labor agreements, and if no agreement is reached, the President of the United States may appoint a Presidential Emergency Board to investigate and report on the dispute and recommend a solution.

to be "fair and demonstrably equitable." Accordingly, on July 29, 1991, PEB 219 became binding on the UTU and the Railroads. The implementing agreement did not impose a national rule for the placement of employees onto the conductor seniority roster, but instead stated that existing rules will "continue in effect."

The Railroad thereafter informed the Plaintiffs and other pre–1985 employees that they would be forced to work under the conductor label and would be placed on the bottom of the conductor seniority roster, effectively stripping them of the seniority they had accrued in years of work as brakemen and placing them on the roster below employees with less overall seniority. The older brakemen would be force-promoted and placed upon the conductor roster as of the date they became conductors.[5] As explained above, the workers hired after November 1, 1985, were placed upon the conductor roster as of their date of hire with the Railroad, thereby permitting them to use their brakemen seniority. Thus, the Plaintiffs alleged that the Railroad created two separate classes of workers to be force-promoted to conductor, treating those hired after November 1, 1985, substantially differently and in a discriminatory fashion based upon their age.

According to the Plaintiffs, the Railroad sought consensus from the Plaintiffs' union, the UTU, regarding the placement of the pre–1985 hires at the bottom of the conductor seniority roster. The Plaintiffs acknowledge that many of the UTU Division Chairmen signed letters accepting the Railroad's placement decision, including Division Chairmen from Knoxville, Tennessee;[6] Macon, Georgia; Danville, Kentucky; and Norfolk, Virginia. The UTU Division Chairman from the Plaintiffs' division, however, refused to sign the letter and refused to consent to the placement of these pre–1985 workers at the bottom of the conductor roster.[7]

In addition to the circumstances surrounding the collective bargaining, the Plaintiffs emphasize other circumstantial evidence of age discrimination. For instance, the Railroad offered a "separation proposal" to the older employees immediately after obtaining the right to force-promote them out of their brakemen positions. The Plaintiffs emphasize the irony of this development to the extent that these workers to whom the separation proposal was offered were the very men the Railroad alleged that it so desperately needed to promote to conductors.

The Plaintiffs also introduced evidence indicating that Railroad supervisors harassed the older workers, made derogatory comments toward them, and made statements expressing animus based upon the age of the workers. These comments allegedly insinuated that the Railroad was eager to remove these older workers from their positions, that "monkeys" would do the job better than these men, and that they had been "screwed" on their job roster seniority placements. The Plaintiffs also introduced evidence indicating that some Railroad supervisory personnel regarded these pre–1985 workers as "high cost" and admitted at trial that the Railroad would be better off without them.

The Railroad submitted evidence at trial defending the discrimination claim by asserting that its placement decisions were founded exclusively upon collective bargaining agreements mandating certain procedures. In promoting the Plaintiffs and placing them at the bottom of the conductor seniority roster, the Railroad maintains that it was simply complying with existing labor agreements with the Plaintiffs' union and exercising au-

---

5. The Railroad placed the pre–1985 employees on the conductor seniority roster with a seniority date of April 1, 1992, and they are presently ranked ahead of everyone who became a conductor after April 1, 1992. They are ranked behind employees hired as trainmen after November 1, 1985, and promoted to conductor prior to April 1, 1992.

6. The Plaintiffs' brief indicated Knoxville, Kentucky, which this Court assumes was a typographical error.

7. The affected men from the Pocahontas Division thereafter filed a grievance seeking to invalidate the Railroads' choice of placement. The arbitration board did not have before it any allegation of age discrimination and ultimately ruled that it could not· invalidate the placement practice based on contractual claims. The board did express that if it possessed the "power of equity," the decision would be different.

thority granted by PEB 219 in 1991, as previously discussed. The Railroad contends that placement is governed by a September 4, 1954, labor agreement requiring the Railroad to place the Plaintiffs at the bottom of the conductor seniority roster. That 1954 agreement indicated that the rights of conductors would commence on the day they passed the required conductor examinations.[8]

The Railroad further maintained that no Railroad supervisor in any position of authority made harassing comments directed toward workers based upon their age. Any negative comments that were uttered, the Railroad contends, were directed toward the seniority rights and benefit packages the older men enjoyed and were not based upon the age of the workers.

In essence, the Plaintiffs' theory of the case, as argued at trial, was that the Railroad sought refuge in the collective bargaining agreements as justification for outright age discrimination. The Railroad contended that the Plaintiffs engaged in subterfuge in their attempt to parlay a collective bargaining decision into a discrimination claim and that the discrimination claim is totally meritless.

When submitted to a jury on February 26, 1997, the jury returned a verdict in favor of the Plaintiffs on the issue of liability. The damages portion of the trial has been stayed pending this Court's ruling in this appeal of the liability issue. In jury interrogatories, the jury answered yes to the question regarding whether "an illicit bias against employees forty years of age and older was a motivating factor" in the Railroad's "decision to place Plaintiffs at the bottom of the conductor roster." The jury also indicated that it found that the Railroad had intentionally discriminated against the Plaintiffs on the basis of age. The jury further reported that it found that the Railroad would not have placed the Plaintiffs at the bottom of the conductor roster absent the impermissible age motivation.

On May 4, 1998, the lower court denied the Railroad's motion for judgment notwithstanding the verdict or in the alternative, a new trial. The Railroad thereafter appealed to this Court. The Railroad maintains that no reasonable jury could have found for the Plaintiffs and that instructions given to the jury created confusion, prejudicing the Railroad and ultimately leading to an invalid verdict.

## II.

### STANDARD OF REVIEW

██ "We review questions of law arising from the proceeding below de novo. We view the evidence, and the evidentiary and inferential determinations that were within the province of the jury, in the light most favorable to the party who prevailed—in this case, the plaintiff." *Haynes v. Rhone–Poulenc, Inc.*, 206 W.Va. 18, 26, 521 S.E.2d 331, 339 (1999). Upon our review of the jury's conclusions, we must determine whether there was sufficient evidence to permit a reasonable juror to find that the Railroad intentionally discriminated against these Plaintiffs based upon their age. In syllabus point five of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984), this Court stated:

In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

██ Further, regarding the lower court's decision to deny the Railroad's motion for judgment notwithstanding the verdict, we

---

8. Article 26 of the 1954 agreement provided in pertinent part as follows:
 1. (a) Conductors will be considered in line of promotion in accordance with seniority, ability and fitness. . . .

 (c) The rights of conductors will commence on the day they pass the required examinations, except when older men are absent. Extra trips in emergencies by men who have not been examined will not be counted.

stated as follows in syllabus point two of *Alkire v. First National Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996):

> In reviewing a trial court's granting of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on the granting of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

## III.

## DISCUSSION

### A.

*Interplay Between Collective Bargaining Agreements and State Discrimination Law*

■ As a preliminary and fundamental matter, this Court acknowledges that resolution of this case does not depend upon any assessment of the appropriateness of collective bargaining agreements between the Plaintiffs' union and the Railroad. In *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the United States Supreme Court explained: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between parties in a labor contract, that claim must either be treated as a § 301 claim [9] . . . or dismissed as pre-empted by federal labor-contract law." 471 U.S. at 220, 105 S.Ct. 1904 (citations omitted). The Supreme Court also noted, howev-

er, that not all labor disputes are pre-empted by Section 301:

> Clearly § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

471 U.S. at 212, 105 S.Ct. 1904.

The Supreme Court specified that it expressly did *not* hold

> that every state-law suit asserting a right that relates in some way to a provision in a collective-bargaining agreement, or more generally to the parties to such an agreement, necessarily is pre-empted by § 301. The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis.

*Id.* at 220, 105 S.Ct. 1904.

With specific reference to the Railway Labor Act, the United States Supreme Court has expressed the identical sentiment: "substantive protections provided by state law, independent of whatever labor agreements might govern, are not preempted under the [Railway Labor Act.]" *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 257, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). The Court reasoned that "no proposed interpretation demonstrates a clear and manifest congressional purpose to create a regime that broadly pre-empts substantive protections extended by the States, independent of any negotiated labor agreement." *Id.* at 255–56, 114 S.Ct. 2239.

Where an employer raised a defense which allegedly required some interpretation of a collective bargaining agreement, the Supreme Court in *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318

---

**9.** Section 301(a) of the Labor Management Relations Act [hereinafter § 301] provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
> 29 U.S.C. 185(a) (1947) (1994 ed.).

(1987), explained that § 301 did not preempt state consideration of the claim.

> [T]he presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court.... [A] defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated.

482 U.S. at 398–99, 107 S.Ct. 2425.

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the United States Supreme Court encountered a plaintiff who had submitted his discrimination claim to arbitration through a collective bargaining agreement. The Court determined that the plaintiff had not foreclosed his rights to pursue his discrimination claim under Title VII of the Civil Rights Act of 1964 and reasoned as follows:

> Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver.

415 U.S. at 51–52, 94 S.Ct. 1011 (citations omitted).

 In this Court's recent examination of these issues in *Greenfield v. Schmidt Baking Co.*, 199 W.Va. 447, 485 S.E.2d 391

(1997), we stated as follows at syllabus point four: "An application of state law is preempted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), only if such application requires the interpretation of a collective-bargaining agreement." Based upon extensive evaluation of federal preemption law, we also explained at syllabus point five of *Greenfield*: "A determination of pre-emption under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), requires a fact specific analysis." [10]

 With reference to the West Virginia Wage Payment and Collection Act, we concluded in syllabus point four of *Ash v. Ravens Metal Products, Inc.*, 190 W.Va. 90, 437 S.E.2d 254 (1993), that " '[t]he mere fact that W.Va.Code, 21–5–4, relates to matters which may be the subject of collective bargaining does not mean that the terms of this statute are preempted by virtue of Section 301 of the [Labor Management Relations Act], 29 U.S.C. § 185 (1947).' Syllabus Point 5, *Lowe v. Imperial Colliery Co.*, 180 W.Va. 518, 377 S.E.2d 652 (1988)." In syllabus point five of *Ash*, we continued in that vein: "An arbitration clause of a collective bargaining agreement cannot nullify the statutory rights given to employees under the West Virginia Wage Payment and Collection Act, W.Va.Code, 21–5–1, *et seq.*"

In *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 336 S.E.2d 204 (1985), an employee instituted an action under West Virginia law against her employer and union for retaliatory discharge allegedly based upon her receipt of workers' compensation benefits. Her discharge after a one-year absence from work was consistent with the terms of a collective bargaining agreement; thus, her challenge was determined to have its foundations in state law rather then any violation of collective bargaining agreements. We therefore

---

10. *See* Syl. Pt. 1, *Chapple v. Fairmont Gen. Hosp., Inc.*, 181 W.Va. 755, 384 S.E.2d 366 (1989) ("Although state and federal courts have concurrent jurisdiction in actions involving an alleged breach of a collective bargaining agreement, the substantive law to be applied in suits under § 301(a) of the Labor Management Relations Act is federal law."); Syl. Pt. 4, *Lowe v. Imperial*

*Colliery Co.*, 180 W.Va. 518, 377 S.E.2d 652 (1988) ("While § 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1947), does not divest state courts of jurisdiction in labor cases, the federal labor law is supreme and is to be applied by state and federal courts alike. State law to the contrary is preempted.").

found that her action was not preempted by the Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185, governing suits by and against labor organizations for contract violations. *Id.* at 560, 336 S.E.2d at 208.

In the present case, we conclude that our review of this state law discrimination claim is not exclusively dependent upon the terms of the collective bargaining agreements.[11] The Plaintiffs do not directly attack the agreements or allege a violation thereof, but instead allege that the Railroad discriminated against them in a more general effort to remove them from its workforce through any means available to it, including discriminatory application of the collective bargaining agreements, intimidation, and hostile comments directed toward the older workers and based upon the age of those workers.

Thus, this Court's perception of the adequacy of the resolutions made through the existing labor agreements is irrelevant.[12] We concentrate only upon the allegations of discrimination and refrain, as the Railroad cautions, from permitting the Plaintiffs to utilize the West Virginia Human Rights Act to reverse modifications in the Railroad industry developed by collective bargaining agreements or PEB 219.

## B.

### *Discrimination Claim*

■ The Plaintiffs maintain that this is a "mixed motive" case, specifically authorized by the West Virginia Human Rights Act. *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 75, 479 S.E.2d 561, 585 (1996). In such case, an employer may indeed have a legitimate basis for its employment decision, and that legitimate basis may have played a role in the ultimate decision. In such mixed motive action, however, the Plaintiffs need prove only that a forbidden intent was a motivating

factor in an employment action. The employer is then liable unless it proves that "the same result would have occurred even in the absence of the unlawful motive." *Id.*

■ In the mixed motive case, the defendant has allegedly "acted for unlawful as well as lawful reasons, and we have accordingly shifted the burden of persuasion on the issue of causation to the defendant and required it, to avoid liability, to prove that the same decision would have been made in the absence of the unlawful reason." *Barlow v. Hester Indus., Inc.*, 198 W.Va. 118, 138, 479 S.E.2d 628, 648 (1996). In *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996), we explained:

> Although we have rejected the circumstantial-direct evidence distinction, we emphasize that the plaintiff does have the burden of proving by a preponderance of the evidence that a forbidden intent was a motivating factor in the adverse employment action. While this is a greater burden than that required under the pretext theory, which is discussed in the next section, we believe it is justified by the fact that, once a plaintiff has met this burden, the burden of persuasion and the risk of nonpersuasion shifts to the defendant.

*Id.* at 390, 480 S.E.2d at 829.

In *Skaggs*, we explained that the "shift of the risk of nonpersuasion" is justified in the mixed motive case.

> We believe this shift of the risk of nonpersuasion is appropriate. First, in a case where the plaintiff proves that the defendant harbored an unlawful motive, it is only fair that the defendant bear the burden of persuasion in sorting through the difficult issue of causation when the evidence shows there have been multiple contributing factors. In so doing, we merely

---

11. The Plaintiffs concede that the Railroad's authority to force-promote the brakemen is not challenged. The Plaintiffs agree that the "workers affected by the PEB plainly have to accept the rights, if offered, and no part of the state-based discrimination claim will alter, infringe upon or change that fact." The Plaintiffs contend, however, that the Railroad's legitimate action in force-promotion does not justify discrimination in the placement on the seniority roster.

12. We note parenthetically that we have held that the West Virginia Human Rights Act "holds unions responsible for discriminatory terms and conditions in collective bargaining agreements." Syl. Pt. 2, in part, *West Virginia Human Rights Comm'n v. United Transp. Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).

adopt the well-established approach used in other contexts. Our motivating factor standard specifically rejects any requirement that some additional threshold, such as the substantial factor test, must be met before the burden shifts. Even if we could describe (and we cannot) what a substantial factor means in this context, we would reject it as unwarranted. If the evidence shows that discriminatory motive entered into the decision making to any degree, then the employer engaged in wrongdoing and should bear the burden on causation. 198 W.Va. at 76, 479 S.E.2d at 586.

In *Martin v. Randolph County Board of Education,* 195 W.Va. 297, 465 S.E.2d 399 (1995), a sex discrimination action, we explained that a "plaintiff is not required to show that the defendant's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor ... was at least one of the 'motivating' factors." 195 W.Va. at 310, 465 S.E.2d at 412, citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 247, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion in which the United States Supreme Court held that where an employer has shown a legitimate motive the plaintiff need not show that the prohibited factor was the sole or principal reason, or "the true reason"). In *Martin,* we concluded that where "the plaintiff proves by

a preponderance of the evidence that an illicit motive entered into the challenged employment decision, then the plaintiff wins unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the illicit motive." 195 W.Va. at 311–12, 465 S.E.2d at 412–13.[13]

In addressing the sufficiency of evidence presented in a discrimination claim, we reasoned as follows in *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986):

Because discrimination is essentially an element of the mind, there will probably be very little direct proof available. Direct proof, however, is not required. What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion. This evidence could, for example, come in the form of an admission by the employer, a case of unequal or disparate treatment between members of the protected class and others by the elimination of the apparent legitimate reasons for the decision, or statistics in a large operation which show that mem-

---

**13.** The mixed motive case burden scheme is a variation of the traditional pretext approach to discrimination cases. As we explained in *Skaggs,*

a mixed motive case *is* a disparate treatment case. "Mixed motive" refers to cases in which a discriminatory motive combines with some legitimate motive to produce an adverse action against the plaintiff. "Disparate treatment" refers to cases in which a discriminatory motive produces an adverse employment action against the plaintiff. As a technical matter, then, mixed motive cases form a subcategory of disparate treatment cases.

*Skaggs,* 198 W.Va. at 74, 479 S.E.2d at 584. In the traditional pretext case, pursuant to the United States Supreme Court directive in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a three-step "burden shifting" analysis is utilized to evaluate proof in discrimination cases. The plaintiff first forwards a prima facie case of discrimination by introducing evidence demonstrating that an adverse employment decision was prompted by his employer's contemplation of improper factors

such as age. In response, the burden is shifted to the employer, who then must introduce evidence tending to demonstrate that the employment decision was founded upon a legitimate, non-discriminatory reason. Finally, the plaintiff must introduce evidence demonstrating that the employer's proffered reason is a pretext, rather than the actual basis for the adverse employment decision. In syllabus point three of *Shepherdstown Volunteer Fire Department v. West Virginia Human Rights Commission,* 172 W.Va. 627, 309 S.E.2d 342 (1983), we explained, in pertinent part:

If the complainant is successful in creating this rebuttable presumption of discrimination, the burden then shifts to the respondent to offer some legitimate and nondiscriminatory reason for the rejection. Should the respondent succeed in rebutting the presumption of discrimination, then the complainant has the opportunity to prove by a preponderance of the evidence that the reasons offered by the respondent were merely a pretext for the unlawful discrimination.

bers of the protected class received substantially worse treatment than others.

178 W.Va. at 170–71, 358 S.E.2d at 429–30.

The Railroad directs our attention to *Hiatt v. Union Pacific Railroad*, 65 F.3d 838 (10th Cir.1995), and alleges that the *Hiatt* decision lends credibility to the Railroad's position in this matter. The *Hiatt* court upheld the entry of summary judgment for the Railroad in a similar case, finding that the Plaintiffs could offer no evidence to refute the Railroad's showing that any "alleged harm to Plaintiffs was caused solely by the interaction of the congressional mandate and the established seniority system" and was therefore not related to age bias. *Id.* at 843. The workers in *Hiatt* had challenged the failure of the Railroad to provide them with special consideration when they were forced to accept more grueling work. The court summarized the Plaintiffs' allegations as follows:

> This transition from experienced brakeman to junior conductor can be abrupt under the best of circumstances: one loses a great deal of choice over one's work, and must again toil at those duties that no one else desires. Traditionally, the prospect of a second stint of grunt work deterred a significant percentage of qualified brakemen from accepting promotion to conductor, and in fact the majority of the Plaintiffs chose to forego promotion and remain brakemen. Mandatory promotion, within the context of the established seniority system, thus thrust a rather traumatic, and unwanted, mid-life career change upon the Plaintiffs. As brakemen, the Plaintiffs could choose to work whatever runs suited them; as conductors, these same individuals must now take what they can get—at an age when their bodies are less resilient, and their lives more settled, than many younger men who hold greater conductor (but less overall) seniority. Unhappy with their situations, and believing themselves to have suffered because of their ages, the Plaintiffs filed suit under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634.

*Id.* at 841.

The Plaintiffs in *Hiatt* contended that the Railroad had:

failed to take measures to mitigate the uniquely deleterious impact of promotion upon the lives of older brakemen. The Plaintiffs assert that the Defendants could have preserved the ability of older brakemen to control their work schedules either by dovetailing brakeman seniority with conductor seniority or by otherwise redistributing the workload to spare older brakemen the more arduous tasks. The Plaintiffs claim that the failure of the Defendants to take these (or similar) steps gives rise to both a disparate impact and a disparate treatment claim.

*Id.*

The *Hiatt* court specifically noted that all the promotees, young and old, were being treated the same under the seniority placement rules. The Plaintiffs in *Hiatt* even admitted that "they were treated no differently under the seniority system than other newly promoted conductors." *Id.* at 842. Thus, the court, "[r]eading the record in the light most favorable to the Plaintiffs," found that "the Plaintiffs have established only that they were inconvenienced by the obligatory promotion to conductor. The Plaintiffs have adduced no evidence to refute the Defendants' contention that the alleged harm to the Plaintiffs was caused solely by the interaction of the congressional mandate and the established seniority system." *Id.* at 843.

The scenario presented in the case sub judice is markedly distinct from *Hiatt*. The *Hiatt* Plaintiffs were not alleging the existence of two distinct groups with different seniority placement rules based upon the age of the workers; the Plaintiffs in the present case are making such allegation. In this case, the Plaintiffs contend that the harm was not exclusively caused by the legitimate collective bargaining agreements, and that the Railroad engaged in discrimination by applying two different standards to guide the seniority roster placement, based upon discriminatory intent.

In *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), although a transfer policy was legitimately authorized for pilots, the method of effectuating the policy was alleged to be dis-

criminatory. In its attempt to effectuate a federally-mandated policy of forced retirement of pilots at age sixty, the employer devised a transfer policy that ultimately discriminated against older workers. The policy allowed pilots to bump less senior workers in other cockpit positions, such as flight engineers, when the reason for leaving the pilot position was due to medical reasons or other disqualifying factors, but would not permit pilots to bump less senior flight engineers when the reason for leaving the pilot position was due to disqualification under the age sixty rule. The United States Supreme Court held that if the airline undertook to establish "bumping rights," it could not do so in a discriminatory fashion. *Id.* at 124, 105 S.Ct. 613.

The Railroad in the present case applied two sets of criteria for establishing seniority rosters for those who were forced to take conductor rights. Under the burden-shifting analysis applicable in a mixed motive case, the burden was ultimately upon the Railroad to prove that the challenged decision would have been made in the absence of an unlawful motive. Thus, the role of the jury became crucial in the resolution of the conflicting evidence.

## C.

### *The Role of the Finder of Fact*

In *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the United States Supreme Court explained:

The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination....

*Id.* at 511, 113 S.Ct. 2742.

In discussing the jury's role in disparate treatment[14] cases, we noted in *Skaggs* that

the jury is charged with the duty of recreating what in fact happened and whether the facts that did happen included intentional discrimination. Thus, if the jury reads the facts and concludes that the employee has proved that a discriminatory motive entered into the employer's decision, it should not matter whether that conclusion was induced by direct or circumstantial evidence.

198 W.Va. at 76, 479 S.E.2d at 586 (citations omitted).

This Court's review of the determinations of a jury is defined in syllabus point three of *Walker v. Monongahela Power Co.,* 147 W.Va. 825, 131 S.E.2d 736 (1963). "In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true." Syllabus point two of *Walker* also provided us with the following guidance: " 'When a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it.' Point 4, Syllabus, *Laslo v. Griffith,* 143 W.Va. 469, 102 S.E.2d 894."

Pursuant to the standards guiding this Court's review of the jury determination in favor of the Plaintiffs in this case, we must examine the evidence in a light most favorable to the Plaintiffs, assuming that all evidentiary conflicts were resolved in favor of the Plaintiffs and assuming as true all facts tended to be proven by the Plaintiffs' evidence. Syl. Pt. 5, *Orr,* 173 W.Va. at 339, 315 S.E.2d at 597. Having thus considered the evidence, we find that the evidence presented by the Plaintiffs was sufficient to sustain the verdict returned by the jury. We do not believe that the verdict was "plainly contrary

---

14. The term " '[d]isparate treatment' refers to cases in which a discriminatory motive produces an adverse employment action against the plain-

tiff." *Skaggs,* 198 W.Va. at 74, 479 S.E.2d at 584. The mixed motive case is a subcategory of disparate treatment claims.

to the weight of the evidence or without sufficient evidence to support it." Syl. Pt. 2, *Walker*, 147 W.Va. at 826, 131 S.E.2d at 737.

## D.

### *Alleged Instructional Error*

■ The Railroad alleges that the instructions provided to the jury created confusion regarding the evidentiary requirements of a claim of age discrimination and provided insufficient guidance to the jury on the law and the issues. Plaintiffs' instruction nine, in court-modified version, provided that an individual may be discriminated against even though he is not in an age protected group if he associates with members of the protected group. The instruction further provided that a person younger than forty years old, who is in the same grouping as older workers, may recover for discrimination.

The Railroad maintains that this instruction constitutes an erroneous statement of the law regarding inclusion of workers under forty years of age, and colors the jury view of the case by utilizing the phrase "target" group of "older workers." The Railroad argues that the instruction could be interpreted to imply the existence of a "grouping" of older workers targeted for their age and is therefore misleading.

■ Our review of the instruction does not lead us to the conclusion that it constituted a misstatement of the applicable law. In discussing age discrimination, West Virginia Code § 5–11–3(k) (1999) defines age to mean "the age of forty or above," and the Railroad maintains that the five Plaintiffs under the age of forty should not have been included in the Complaint as a matter of law. The five Plaintiffs claim, however, that they have been properly included as Plaintiffs by operation of either the "continuing violation" doctrine or their association with the protected group.[15] In resolving the matter of inclusion of the five Plaintiffs under age forty, we recognize the necessity for the protection of the Human Rights Act to be extended to individuals who suffer collateral harm from discriminatory practices committed in violation of the Act. In examining the potential relief available to the five Plaintiffs who were under the age of forty at the time the discrimination was initiated in this case, the remedy available through West Virginia Code § 5–11–9(7) (1999) is of particular intrigue. That section provides as follows:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

(7) For any person, employer, employment agency, labor organization, owner, real estate broker, real estate salesman or financial institution to: (A) Engage in any form of threats or reprisal, or to engage in, or hire, or conspire with others to commit acts or activities of any nature, the purpose of which is to harass, degrade, embarrass or cause physical harm or economic loss or to aid, abet, incite, compel or coerce any person to engage in any of the unlawful discriminatory practices defined in this section.

Pursuant to this section, where the employer engages in activities of any nature, the purpose of which is to cause economic loss, the employer has committed an unlawful discriminatory practice under the Act. Thus,

---

15. As support for their claim of "association," they cite *West Virginia Human Rights Commission v. Wilson Estates, Inc.*, 202 W.Va. 152, 503 S.E.2d 6 (1998), in which this Court addressed the West Virginia Fair Housing Act and held that a cause of action exists for discrimination directed against tenant based on race of those individuals with whom tenant chooses to associate. *Id.* at 203, 503 S.E.2d at 7. *Wilson Estates* involved entitlement to pursue a cause of action under the Fair Housing Act after having associated with African Americans and being discriminated against on the basis of that affiliation. Inclusion as Plaintiffs in a cause of action available only to individuals over the age of forty through the West Virginia Human Rights Act is not a corresponding right, and we therefore reject the contention that the five Plaintiffs under the age of forty at the time of the challenged action are properly included as Plaintiffs.

We also reject the Plaintiffs' contentions that the continuing violation doctrine can be utilized to justify their inclusion as Plaintiffs. The continuing violation doctrine is available as mechanism to toll the statute of limitations and is not appropriate for consideration in this context.

whether entertained as a derivative or an independent claim, individuals who may not otherwise be covered under the specific requirements of the Act can seek relief through the more general provisions of West Virginia Code § 5–11–9(7). In the case sub judice, the five individuals have asserted that they were victims of an unlawful discriminatory practice perpetrated through the Railroad's engagement in discriminatory activities, and we find that relief through section 5–11–9(7) is appropriate. Thus, despite the fact that they had not attained the age of forty at the time of the alleged discriminatory action, they are appropriately considered collateral victims of the discrimination against the members within the protected age group and can be viewed as suffering the same consequences as those within the protected age group.

 West Virginia Code § 5–11–15 (1999) provides that the West Virginia Human Rights Act "shall be liberally construed to accomplish its objectives and purposes." *See Williamson v. Greene,* 200 W.Va. 421, 490 S.E.2d 23 (1997); *Dobson v. Eastern Associated Coal Corp.,* 188 W.Va. 17, 422 S.E.2d 494 (1992); *Casteel v. Consolidation Coal Co.,* 181 W.Va. 501, 383 S.E.2d 305 (1989). West Virginia Code § 5–11–2 (1989) explains the objectives and purposes of the Human Rights Act, as follows: "It is the public policy of the state of West Virginia to provide all of its citizens equal opportunity for employment.... Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons...." In syllabus point three of *Shell v. Bechtold,* 175 W.Va. 792, 338 S.E.2d 393 (1985), we explained:

"'A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the

general purpose and design thereof, if its terms are consistent therewith.' Syllabus Point 5, *State v. Snyder,* 64 W.Va. 659, 63 S.E. 385 (1908)." Syl. Pt. 1, *State ex rel. Simpkins v. Harvey,* [172] W.Va. [312], 305 S.E.2d 268 (1983).

*See also* Syl. Pt. 7, *State ex rel. Goff v. Merrifield,* 191 W.Va. 473, 446 S.E.2d 695 (1994); Syl. Pt. 1, *State v. White,* 188 W.Va. 534, 425 S.E.2d 210 (1992). We consequently find that the five Plaintiffs under the age of forty at the time of the alleged discriminatory action may recover under the West Virginia Human Rights Act and were properly included by the lower court as Plaintiffs. We hold that collateral victims of discrimination are entitled to relief under W. Va.Code § 5–11–9(7) (1999) upon establishing that the employer has engaged in an unlawful discriminatory practice, such as activities designed to cause economic loss. Such collateral victims are properly included as Plaintiffs in a cause of action initiated by other victims of discrimination under the West Virginia Human Rights Act.

 As we explained in *Skaggs,* "our review of the legal propriety of the trial court's instructions is *de novo.*" 198 W.Va. at 63, 479 S.E.2d at 573, citing *State v. Guthrie,* 194 W.Va. 657, 671, 461 S.E.2d 163, 177 (1995). We explained as follows in syllabus point one of *State v. Hinkle,* 200 W.Va. 280, 489 S.E.2d 257 (1996): "As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is *de novo.*"

We have expressed our review of challenges to jury instructions, as follows: "To challenge jury instructions successfully, a challenger must first demonstrate the charge as a whole created a substantial and ineradicable doubt about whether the jury was properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case." *Skaggs,* 198 W.Va. at 70, 479 S.E.2d at 580.

In syllabus point four of *Guthrie*, we stated:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, as long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

194 W.Va. at 663–64, 461 S.E.2d at 169–70.

Regarding the potential confusion created by instruction nine, we are not persuaded that the use of the phrase "grouping of older workers" could have confused the jury. The Plaintiffs' whole case centered upon separation of the Plaintiffs and other workers into two groups, and indeed the Railroad admits that two distinct groups were legitimately created. While the Railroad is disturbed by the characterization of the group as "older," we discern no evidence that the inclusion of such language within the instructions conferred unreasonable credibility to the Plaintiffs' theories of discrimination. Through the presentation of evidence, the jury was aware of two distinct groups, one including new hirees and the other included longstanding employees hired prior to 1985. The use of the term "older workers" was not prejudicial.

The Railroad also contends that defendant's instruction four was improperly modified by the lower court. The Railroad had requested the court to instruct the jury that the Railroad's placement of the Plaintiffs at the bottom of the conductor seniority roster was "required" by the 1954 agreement. The lower court modified the instruction to provide that such placement was "permitted" by the agreement. The Railroad maintains that the instruction as modified conveys the false impression that the Railroad had some hidden agenda or illicit reason to have placed the Plaintiffs at the bottom of the roster and that the 1954 agreement was not binding.

Once again, we do not find that the jury could have been misled by this instruction. In syllabus point six of *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995), this Court explained:

The formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.

We find no abuse of discretion in the alteration from "required" to "permitted."

The Railroad contends that court instruction C also confused the jury. It provided that the age discrimination claim existed "independently" of collective bargaining agreements and rights under federal law. The Railroad argues that the instruction was confusing since the discrimination claim should have been considered in light of the agreements, not independent thereto. We find no merit to the Railroad's contentions. As we have emphasized, the discrimination claim under the West Virginia Human Rights Act is a separate and distinct claim from any claim the Plaintiffs could have pursued through the collective bargaining agreements. Thus, the lower court's instruction was proper and was not misleading.

The Railroad asserts that court instruction E confused the jury by explaining that the Plaintiffs could not directly or indirectly consent to discrimination, "either individually or through his Union or otherwise." The Railroad contends that there is no factual basis for that instruction since the Plaintiffs did not challenge the validity of the collective bargaining agreements. While we do view this instruction as somewhat superfluous, we do not find that it created confu-

sion which prejudiced the Railroad. The Railroad had requested and received an instruction informing the jury that the ranking of the Plaintiffs was "taken to comply with a facially neutral collective bargaining agreement and was a lawful nondiscriminatory reason." The Railroad contends that instruction E blunted the effect of other instructions regarding the compliance with the agreements and confused the jury. As we explained above, our review of the instructions, in ascertaining the potential confusion to the jury, must be based upon the instructions as a whole. We do not find that this instruction tainted the jury's view of the case or prejudiced the Railroad.

 The Railroad also complains that the lower court improperly refused to give Railroad instructions eight and nine which would have instructed that jury that the placement of the Plaintiffs on the seniority roster was authorized by PEB 219 and was therefore not age discrimination and that reduction in crew sizes was not per se discrimination. The lower court would have been unjustified in instructing the jury that the placement was not age discrimination. Such instructions would have obviated the need for the jury. As discussed above, refusal to give an instruction is reviewed for abuse of discretion. Where the alleged error entails the lower court's refusal to give a requested instruction, this Court on review "will ... presume[ ] that [the] trial court acted correctly ... unless it appears from the record in the case ... that the instructions refused were correct and should have been given." *Coleman v. Sopher*, 201 W.Va. 588, 602, 499 S.E.2d 592, 606 (1997) (internal quotations and citations omitted). We discern no abuse in the refusal to provide the requested instructions.

 The Railroad also contends that the lower court erroneously refused to give Railroad instruction five which would have explained that the jury must decide what motivated the persons making the seniority decision and that stray remarks about age cannot be attributed to anyone other than the speaker of those remarks. The instruc-

tion would have informed the jury as follows:

> "[S]tray remarks" about age, if you find there are any, that were made by individuals who were not involved in the decision-making process, are not evidence of an illicit motive on the part of [the Railroad].... [V]oluntary buy-out programs—even attractive programs aimed at inducing employees to retire who might otherwise not retire—are not of themselves age discrimination, and are not of themselves evidence of age discrimination.... [T]he Human Rights Act does not prevent an employer from making decisions based on an employee's cost to the company.... [E]mployer action motivated by an interest to avoid the costs or benefits that an employee may enjoy by virtue of his years of service with a company, is not action motivated by an illicit bias against employees because of how old they are.

We see no abuse of discretion in the refusal to give such instruction. The Plaintiffs emphasize that such instruction would have constituted impermissible comment by the lower court on the evidence. West Virginia Rule of Civil Procedure 51 explains that a trial court, "in giving instructions to the jury ... shall not comment upon the evidence." Even if this instruction would not have constituted a "comment" on the evidence and would not have conveyed erroneous information, it would have allowed the court to essentially engage in discourse with the jury which would have been more appropriately addressed by counsel for the Railroad.

 The Railroad maintains that the jury was further confused by Plaintiff's instruction one, a respondeat superior instruction, implying that the Railroad was responsible 'for all remarks made by Railroad personnel, and by court's instruction D which informed the jury that it should consider the "whole package" of terms and conditions of the Plaintiffs' employment. The Plaintiffs contend that the standard respondeat superior instruction was appropriate and did not confuse the jury regarding its role in determining whether the Railroad had engaged in

discrimination.[16] The Plaintiffs also assert that since discrimination can be proven by direct or indirect evidence, the "totality of circumstances" phrase was not misleading. We agree and find no that no confusion was created by the instruction.

Upon review of the instructions given to the jury in this case, we find that the jury was properly informed of the intricacies of a discrimination claim and the appropriate standard of proof for both the Railroad and the Plaintiffs. We do not find, as required by *Skaggs* as a prerequisite to a successful challenge to jury instructions, that the "charge as a whole created a substantial and ineradicable doubt about whether the jury was properly guided in its deliberations." 198 W.Va. at 70, 479 S.E.2d at 580.

## IV.

### CONCLUSION

Our review of the record and the arguments of counsel in this matter leads us to the conclusion that the jury verdict was properly supported by the evidence. When faced with the Plaintiffs' evidence of age discrimination, the Railroad submitted a legitimate, non-discriminatory reason for the challenged action, namely the collective bargaining agreements of 1954 and 1988 and PEB 219. The Railroad contended that it was exclusively the application of those mandates which formed the foundation for its seniority roster placement decisions. The Plaintiffs tried their action on the mixed motive theory; thus, it became the responsibility of the jury to determine whether the same result would have occurred absent an unlawful discriminatory motive. The jury specified in interrogatories that it determined that the Railroad would not have placed the Plaintiffs at the bottom of the conductor seniority roster absent the impermissible age motivation. Viewing the evidence and possible inferential

determinations in a light most favorable to the Plaintiffs, we do not find that the jury's verdict was plainly contrary to the weight of the evidence or without sufficient evidence to support it.

Consequently, we affirm the decision of the lower court.

Affirmed.

Justice SCOTT did not participate in the decision in this case.

Judge JOHN S. HRKO, sitting by temporary assignment.

DAVIS, Justice, concurring in part and dissenting in part:

The majority has committed an injustice by indulging itself in the ill-advised self-appointed role of judge and jury. Through its opinion, the majority has miserably failed in its commitment to uphold basic legal standards and has deliberately pummeled fundamental concepts of due process and appellate jurisdiction in this State. Reduced to its analytical essence, this case presented two general issues for resolution by this Court. First, was the judgment valid as to the age discrimination claim brought by the 62 plaintiffs who were 40 years old, or older, at the time of the alleged discrimination? Second, was the judgment valid as to the age discrimination claim brought by the five plaintiffs who were *under* 40 years of age at the time of the alleged discrimination? As to the first question, the majority ruled that the judgment for the 62 plaintiffs was valid. With this conclusion I agree and therefore concur in that part of the majority's opinion. As to the second question, the majority ruled that, under a theory dubbed "collateral victim," the judgment for the five plaintiffs was valid. With this conclusion I disagree and therefore

**16.** We acknowledged in *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990), that two types of "tests have developed for imposing liability on an employer for discriminatory acts of its employees." 184 W.Va. at 245, 400 S.E.2d at 253.

If a discriminatory act has been committed by an officer or a supervisory employee, an employer may be held liable without a showing that the employer knew or reasonably should

have known of the misconduct, except if the supervisory employee was acting outside the scope of his employment. Second, for the acts of nonsupervisory employees, an employer can be found liable if he knew or reasonably should have known of the discriminatory acts, or expressly or impliedly authorized or ratified them.

*Id.* (footnote omitted).

dissent to that portion of the majority's opinion.

The basis of my dissent is that Norfolk and Western Railway Company (hereinafter "Norfolk & Western") was denied state and federal constitutional due process by the majority's decision to create a "new" cause of action under W. Va.Code § 5–11–9(7), and to then *sua sponte* decide that cause of action against Norfolk & Western on appeal.

### DENIAL OF DUE PROCESS

Five of the plaintiffs were not 40 years old or older at the time they were allegedly discriminated against because of their age. Yet, those five plaintiffs attempted to invoke a cause of action for age discrimination under our State's Human Rights Act. Under W. Va.Code § 5–11–3(k) of the Human Rights Act, there is an express legislative requirement that to maintain a cause of action for age discrimination a party must be "forty or above" at the time of the discrimination. These five plaintiffs have attempted to get around the legislatively-imposed age limitation by advancing two alternative theories. They assert their age discrimination cause of action either on the basis of a "continuous tort" or under the "association doctrine."

On appeal the majority opinion rejected both theories proffered by the five plaintiffs. The majority opinion ruled that neither the continuous tort nor the association doctrine were applicable to the plaintiffs' claim. Based upon the historical legal doctrines of this Court and the time-honored precedents of Anglo–American jurisprudence, the majority should have ended its analysis and reversed the judgment as to these five plaintiffs. The parties presented below and argued on appeal *only* the theories of continuous tort and the association doctrine. Thus, based upon settled precedent, the majority was compelled to terminate its analysis. *See Kronjaeger v. Buck-*

*eye Union Ins. Co.*, 200 W.Va. 570, 585, 490 S.E.2d 657, 672 (1997) ("We frequently have held that issues which do not relate to jurisdictional matters and which have not been raised before the circuit court will not be considered for the first time on appeal to this Court."); Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 482 S.E.2d 218 (1996) ("[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review."); *Barney v. Auvil*, 195 W.Va. 733, 741, 466 S.E.2d 801, 809 (1995) ("Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered."); *Whitlow v. Board of Educ. of Kanawha County*, 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993) ("Our general rule in this regard is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal."); *Michigan Nat'l Bank v. Mattingly*, 158 W.Va. 621, 626, 212 S.E.2d 754, 757–58 (1975) ("[T]his Court will not consider nonjurisdictional questions not acted upon by the trial court."); Syl. pt. 4, *Wheeling Downs Racing Ass'n v. West Virginia Sportservice, Inc.*, 157 W.Va. 93, 199 S.E.2d 308 (1973) ("This Court will not consider questions, nonjurisdictional in their nature, which have not been acted upon by the trial court."); *Konchesky v. S.J. Groves & Sons Co., Inc.*, 148 W.Va. 411, 414, 135 S.E.2d 299, 302 (1964) ("[I]t has always been necessary for a party to object or except in some manner to the ruling of a trial court, in order to give said court an opportunity to rule on such objection before this Court will consider such matter on appeal.").[1]

---

1. We have explained this limited scope of review thusly:

> The rationale behind this rule is that when an issue has not been raised below, the facts underlying that issue will not have been developed in such a way so that a disposition can be made on appeal. Moreover, we consider the element of fairness. When a case has proceed-

ed to its ultimate resolution below, it is manifestly unfair for a party to raise new issues on appeal. Finally, there is also a need to have the issue refined, developed, and adjudicated by the trial court, so that we have the benefit of its wisdom.

*Whitlow v. Board of Educ. of Kanawha County*, 190 W.Va. at 226, 438 S.E.2d at 18.

The majority *sua sponte* decided in this opinion that it would create a new theory of liability to benefit these five plaintiffs. Embarking on this course, the majority determined that the independent cause of action for economic loss found in W. Va.Code § 5–11–9(7)(A) would partly save the plaintiffs' judgment. However, in order to completely save the judgment, the majority created a unique creature in discrimination law and titled it "collateral victim." In doing so, the majority proclaimed that, while the five plaintiffs did not meet the age discrimination requirement, they were nevertheless collateral victims of age discrimination who suffered economic loss. The majority then concluded that under W. Va.Code § 5–11–9(7)(A) and the collateral victim doctrine, the plaintiffs' judgment should be sustained.[2]

This result obtained in the majority opinion, though, is just plain wrong. The plaintiffs did not even assert W. Va.Code § 5–11–9(7)(A) at the trial level or on appeal. Nor did the plaintiffs present any evidence regarding W. Va.Code § 5–11–9(7)(A) at the trial level or on appeal. Neither did Norfolk and Western present evidence to rebut such a cause of action under W. Va.Code § 5–11–9(7)(A) at the trial level or on appeal. Presumably, such evidence is lacking because none of the parties envisioned the resolution of their controversy on this ground. By its decision in this case, the majority has determined that in West Virginia a plaintiff no longer has to present a claim at the trial court level in order to prevail. The majority decision proclaims that the Supreme Court of Appeals of West Virginia has the authority to create a cause of action for a plaintiff and to render judgment for him or her. Further, the majority decision has stated unequivocally that in West Virginia a defendant no longer has a right to know the basis of a cause of action and no longer has a right to present evidence on a cause of action. This view of litigants' rights is erroneous.

Fundamental to the jurisprudence of all civilized nations is the idea of notice and an opportunity to be heard for all parties. In the United States, this concept has taken on constitutional dimensions.[3] In both the federal constitution and the West Virginia Constitution, due process of law has been guaranteed to everyone.[4] "The most basic of the procedural safeguards guaranteed by the due process provisions of our state and federal constitutions are notice and the opportunity

**2.** Let me be clear here, because the majority decision is very unclear. The majority has invoked W. Va.Code § 5–11–9(7)(A) and attached a spurious and totally undefined doctrine to it called "collateral victim." Together, the statute and the doctrine represent a new cause of action in the State of West Virginia. Obviously, this Court has the inherent authority to recognize a new cause of action. However, there are limited ways in which this may constitutionally be accomplished. First, a party may advocate a new theory at the trial level, prevail, and on appeal this Court may recognize the new cause of action. Second, if a party advocates a new cause of action below, but is prevented from litigating the matter, on appeal this Court may recognize the unlitigated new cause of action and remand the matter for trial. *See West Virginia Human Rights Comm'n v. Wilson Estates, Inc.*, 202 W.Va. 152, 503 S.E.2d 6 (1998) (recognizing a new unlitigated cause of action on appeal and remanding for trial); *Persinger v. Peabody Coal Co.*, 196 W.Va. 707, 474 S.E.2d 887 (1996) (recognizing a new unlitigated cause of action on a certified question to the Court and remanding for trial); *Mandolidis v. Elkins Indus., Inc.*, 161 W.Va. 695, 246 S.E.2d 907 (1978) (recognizing a new unlitigated cause of action on appeal and remanding for trial). Until the decision in this case, this Court has never *sua sponte* created a cause of action and decided the merits of the new cause of action against a defendant. Anglo-American jurisprudence simply prohibits such conduct by an appellate court.

**3.** "The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked." *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 246, 64 S.Ct. 599, 606, 88 L.Ed. 692, 705 (1944).

**4.** Article III, Section 10, of the West Virginia Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." This same guarantee is articulated in the Fourteenth Amendment to the United States Constitution, which provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Over sixty years ago, this Court firmly stated that "[t]he due process of law guaranteed by the State and Federal Constitutions, when applied to procedure in the courts of the land, requires both notice and the right to be heard." Syl. pt. 2, *Simpson v. Stanton*, 119 W.Va. 235, 193 S.E. 64 (1937).

to be heard, which are essential to the jurisdiction of the court in any pending proceeding." *State ex rel. United Mine Workers of America, Local Union 1938 v. Waters,* 200 W.Va. 289, 297, 489 S.E.2d 266, 274 (1997). *See Chesapeake & Ohio Sys. Fed'n v. Hash,* 170 W.Va. 294, 299, 294 S.E.2d 96, 101 (1982). Moreover, "the court which undertakes to determine the rights of the parties must have jurisdiction of the proceeding, ... the parties to the proceeding must have due notice, and ... they must be afforded a reasonable opportunity to be heard before their rights are adjudicated or determined." *Walter Butler Bldg. Co. v. Soto,* 142 W.Va. 616, 636, 97 S.E.2d 275, 287 (1957). *See also State ex rel. Peck v. Goshorn,* 162 W.Va. 420, 249 S.E.2d 765 (1978); *State ex rel. Payne v. Walden,* 156 W.Va. 60, 190 S.E.2d 770 (1972); *State ex rel. Bowen v. Flowers,* 155 W.Va. 389, 184 S.E.2d 611 (1971).

Due process of law prohibits all courts from denying any defendant the right to know, in advance, the basis of a plaintiff's cause of action.[5] Due process of law also prohibits all courts from denying a defendant the right to present a defense to a cause of action.[6] "Both federal and state due process clauses require that a party to a law suit be afforded adequate notice and a realistic opportunity to be heard in his own defense." *State ex rel. Thomas v. Neal,* 171 W.Va. 412, 413, 299 S.E.2d 23, 25 (1982). The majority opinion has proclaimed that due process of law no longer exists in West Virginia for civil defendants. *But see Mellon–Stuart Co. v. Hall,* 178 W.Va. 291, 300, 359 S.E.2d 124, 133 (1987) ("Longstanding due process protections such as notice and an opportunity to be heard are scrupulously applied."); *Schupbach v. Newbrough,* 173 W.Va. 156, 158, 313 S.E.2d 432, 435 (1984) ("The due process clauses of our State and Federal Constitutions afford parties the procedural rights of notice and opportunity to be heard."). The majority decision has taken an affirmative position that in West Virginia civil defendants are *persona non grata.*

The decision in this case clearly signals that the majority has lost touch with the constitutional restraints on this Court. The majority has no authority to create a cause of action against a defendant, to refuse to permit the defendant to defend the cause of action, or to pronounce judgment against the defendant on the new unlitigated cause of action.[7] "[B]efore there can be any final

---

5. The majority decision has also stripped plaintiffs of the right to know in advance upon what theory they, themselves, will proceed. Obviously, plaintiffs will not complain about the loss of this right, because they will always benefit from the majority's new procedure of *sua sponte* creating and deciding the merits of a new and unlitigated cause of action.

6. It was firmly set out in Syllabus point 1 of *Simpson v. Stanton,* 119 W.Va. 235, 193 S.E. 64 (1937), that the constitutional guarantee of due process law,

> properly applied, secures to a litigant a reasonable opportunity to be heard when the processes of the courts are invoked against him; and where that opportunity has been denied by the refusal to grant a reasonable time in which to prepare and file pleadings setting up his defense, this [C]ourt will not pass on the merits of the case until opportunity is given to file such pleadings in the court of original jurisdiction, and a hearing had thereon in said court.

7. We previously have attempted to articulate the facets of constitutional due process:

> Though it is difficult, perhaps impossible, to define fully and accurately due process of law or to visualize or enumerate the particular requirements of due process of law in the various and complicated situations which occur in the field of constitutional law, due process of law has been held to mean that the court which undertakes to determine the rights of the parties must have jurisdiction of the proceeding, that the parties to the proceeding must have due notice, and that they must be afforded a reasonable opportunity to be heard before their rights are adjudicated or determined. It has been stated generally that the requirement of due process of law is satisfied when a trial is had according to the settled course of judicial proceedings as regulated by the law of the state. This Court has said that due process of law means the due course of legal proceedings according to the rules and the forms which have been established for the protection of private rights. Due process of law is such procedure as is within the limits of those fundamental principles of liberty and justice which underlie our civil and political institutions. One requirement of due process of law is that every defendant must be given his day in court. The underlying purpose of the due process of law clauses of the federal and state constitutions is to guarantee that the rights of persons may be dealt with in judicial proceedings only after due notice and a fair and reasonable opportunity for a hearing in

adjudication of [a litigant's] property rights, a person deprived of property must be afforded notice and a reasonable opportunity to be heard." *Anderson v. George,* 160 W.Va. 76, 77, 233 S.E.2d 407, 408 (1977). The majority's *sua sponte* procedure in this case undermines the essence of democracy and fair play. "It is fundamental to our constitutional structure that parties will be treated fairly by government and courts." *State ex rel. Graves v. Daugherty,* 164 W.Va. 726, 727, 266 S.E.2d 142, 143 (1980).[8]

I must, therefore, strongly dissent from the majority's decision regarding the five plaintiffs who were under the age of 40 at the time of the alleged discriminatory action. I am authorized to state that Justice Maynard joins me in this dissent and also reserves the right to file a separate opinion.

MAYNARD, Justice, concurring in part; dissenting in part:

(Filed Dec. 17, 1999)

I concur with Justice Davis' dissent, but I write separately to reiterate a crucial point. Even though I cannot say it any better than Justice Davis did in footnote 2, let me be perfectly clear that this Court cannot and should not *sua sponte* create a new cause of action and simultaneously decide the merits of the new cause of action against the defendant.

Justice Davis mentions the only two ways this Court can constitutionally recognize a new cause of action. Because I believe this is so important, let me say it again: (1) a party may advocate a new theory at the trial level and prevail; on appeal, this Court may recognize the new cause of action, or (2) a party may advocate a new cause of action at the trial level but be prevented from litigating the matter; on appeal, this Court may recognize the unlitigated new cause of action and remand for trial. That did not happen here.

By creating a new cause of action and turning the decision on this new cause of action, the majority denies this defendant due process. The defendant has not had and will not have the opportunity to rebut a cause of action under W.Va.Code § 5–11–9(7)(A) and the collateral victim doctrine because no such evidence was presented in this case.

Because I believe in the Constitution of the United States and the Constitution of the State of West Virginia, I dissent. I am authorized to state that Justice Davis joins me in this dissent.

accordance with procedure which has been ordained for the preservation of personal and property rights.

*Walter Butler Bldg. Co. v. Soto,* 142 W.Va. 616, 636, 97 S.E.2d 275, 287 (1957) (citations omitted).

**8.** "One of the basic constitutional guarantees of due process is, of course, that no one shall be

deprived of a substantial right by an arm of the State without notice and the opportunity to be heard in a meaningful manner." *In re Willis,* 157 W.Va. 225, 239, 207 S.E.2d 129, 138 (1973).