# CHARLESTON

## STATE v. SNYDER.

Submitted February 7, 1908.    Decided December 22, 1908.

1. TAXATION—*Tax Deed—Estoppel.*

    The state is estopped by section 29 of chapter 31 of the Code from proceeding to sell, as forfeited for non-entry in the name of the former owner, land conveyed by a sheriff to a purchaser, pursuant to sale thereof for non-payment of taxes thereon, though the deed, because of defects in the sale proceeding, is void as to the former owner and fails to vest his title in the grantee therein. (p. 664.)

2. SAME.

    By making such deed conclusive evidence, against all persons except the former owner, his heirs and assigns and those who might have redeemed the land within one year after the date of the sale, the statute works, by estoppel, a release, grant or transfer of the title of the former owner to the grantee therein, upon the forfeiture of such title for failure of the former owner to keep the land taxed in his name and the taxes thereon paid for five successive years. (p. 664 )

3. SAME—*Persons Concluded—State.*

    Though the statute in question does not mention the state by name, as being one of the persons concluded by such deed, it must be construed as including the state in said class, so as to make it harmonize with the principles and public policy, made manifest by the organic, statutory and judicial system of law of this state, relating to taxation of land and the settlement of land titles, as an incident of the exercise of the power of taxation. (p. 665.)

4. SAME—*Conclusiveness.*

    The express saving in said section 29, in favor of the state, counties, districts, school districts and municipal corporations, does

not confer upon the state power to set aside a tax deed, for the purpose of availing herself of a forfeiture of the former owner's title; but only to proceed, notwithstanding the defective deed, to enforce any lien she may have on the land for prior taxes thereon, treating it, not as her land, but as the land of the tax-deed grantee, or the former owner, for such purpose and to such extent. (p. 666.)

5. STATUTES—*Construction With Reference to Other Statutes.*

A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith. (p. 667.)

Appeal fom Circuit Court, Randolph County.

Bill by the State against Henry Snyder, Eli M. Upton and others. Decree for Hutton, and the State and Henry Snyder and such others appeal.

*Affirmed.*

C. H. SCOTT, E. D. TALBOTT, JAKE FISHER, and BYRON CLARK, for appellants.

LEW GREYNOLDS, for appellee.

POFFENBARGER, PRESIDENT:

Henry Snyder and others and The State of West Virginia complain, on this appeal, of a decree of the circuit court of Randolph county, dismissing a bill in equity, filed by said State, the object of which was to cause the sale of a tract of land, containing 1,000 acres, situate in said county, as forfeited, in the name of William A. and Henry Snyder, to the state, for non-entry by them for the purposes of taxation. Snyder and others, admitting the forfeiture, claimed the right to redeem, by payment of taxes and costs; but the court, deeming the title to be in one Eli M. Upton, another party to the suit, and all taxes to have been paid by him and his predecessors in title, so decided and dismissed the bill.

The material facts, disclosed by the record, are as follows:

Henry Snyder and William Snyder, as assignees of William A. Snyder, obtained from the Commonwealth of Virginia, a grant of said tract of land, by a patent, bearing date, January 1, 1857. Its location is in Randolph county, but near the line between that county and Webster county, and, on the formation of the latter, in the year 1860, was supposed, owing to uncertainty as to the location of the county line, to be in Webster county, wherefore it was charged with taxes in said county for the years 1865 to 1869, inclusive, in the names of Henry and William Snyder, and having been returned as delinquent for non-payment of taxes, was sold in the year 1870 to T. F. Cherry, to whom a deed, conveying the same, in pursuance of said sale, was afterwards executed by James Woodzell, Recorder of said county, and duly recorded. By reason of the destruction of the records of said county by fire, the date of said deed is unascertainable, but the substance of the record of said instrument was restored, by proceedings under section 17 of chapter 130 of the Code. Said Cherry conveyed the land to C. P. Dorr by a deed which was recorded in said county of Webster and likewise destroyed by a fire. Dorr and Elihu Hutton, by deed dated the 27th day of July, 1888, conveyed to J. B, Walker, William Porter, J. G. Lyttle and W. A. Porter, several tracts of land, aggregating, in quantity, 10,012 acres, among which was said 1,000 acre tract, described therein as having been surveyed for W. A. Snyder. The deed from Cherry to Dorr seems not to have been restored, but by deed bearing date January 18, 1892, the heirs of Cherry executed to William Porter and others, grantees of Dorr and Hutton, a deed confirming the conveyance from Cherry to Dorr. By deed dated the 24th day of April, 1894, Porter and others, grantees of Dorr and Hutton, conveyed said 10,012 acres of land to Marsenus S. Briggs, who, by deed dated January 4, 1897, conveyed the same to Eli Upton.

In the meantime, January 14, 1882, George W. Yocum, commissioner of school lands for Randolph county, filed a report and petition in the circuit court of said county, for the purpose of obtaining a sale of said 1,000 acre tract of land, as forfeited in the name of William and Henry Snyder for failure to have the same charged with taxes. In that proceeding, William and Henry Snyder, as well as W. A.

Porter and others, filed their respective petitions, claiming the right to redeem. There was a reference to a commissioner and further proceedings in the manner then prescribed by the statute, resulting in a decree, permitting the Snyders to pay the taxes on the land and adjudicating, in their favor, a redemption thereof from forfeiture, so far as the title thereto had become vested in the state. On an appeal from that decree, this Court reversed it and the cause was remanded for further proceedings, as appears from the decision reported in 42 W. Va. 357. One of the reasons assigned for the reversal was the passage of chapter 24 of the Acts of 1893, making very material alterations in the law relating to such proceedings and requiring all suits and proceedings for the sale of forfeited, waste and unappropriated and escheated lands, instituted since the 12th day of March, 1891, in which there had been no sale, to be discontinued and dismissed. No further proceedings seem to have been had in that cause. Presumably, it was dismissed, as this suit was instituted on the 3rd day of November, 1899, and an amended bill, relating to the same lands, filed in 1901, making new parties among whom were the Porters, Lyttle, Walker, Dorr, Hutton, McGraw, Briggs and Upton. On the 22nd day of October. 1901, Henry Snyder and others filed their answer to the bill and amended bill, and on the 5th day of May, 1904, an amended answer. Upton filed an answer by leave of the court before the commissioner to whom the cause was referred. On the 24th day of January, 1905, Upton filed a supplemental petition and answer, setting up an alleged adjudication in his favor, in another suit commenced by the State of West Virginia on the 6th day of March 1900, against William A. Porter and others, for the purpose of selling as forfeited lands, two tracts or parcels of land, in one of which was included said 1,000 acre tract. He alleged that, in said cause, he had filed a petition in October, 1901, claiming to be the owner of said tracts, and asked permission to redeem the same, and that such proceedings were had, upon said petition, that he was permitted to redeem said two tracts, one containing 1,000 acres, and the other 6,378 acres, of which last tract said 1,000 acres, claimed by Snyder and others, was a part. With his said supplemental petition and answer, he exhibited the record in said last mentioned

cause. To said supplemental petition and answer, Snyder and others filed a special reply, denying that they were parties to said cause of the *State* v. *Porter* and others, and that they had any notice thereof or knew anything of it until the filing of said petition and answer. They further denied the jurisdiction of the court in said last mentioned cause, as to said tract of 1,000 acres, because the same constituted the subject matter of this suit which had been previously instituted and was open and undetermined at the time of the commencement of said suit against Porter and others. As further ground of denial of the alleged adjudication relied upon they represent that the petition filed by Upton in the cause of the *State* v. *Porter* and others, as well as the bill filed therein, wholly failed to indicate in any manner that said 1,000 acres was in any way involved or included in said proceedings.

That the Snyder tract of land is included in the 10,012 acres, claimed by Upton, under the successive conveyances from Dorr and Hutton, heirs of T. F. Cherry, Porter and others, and Marsenus Briggs, is undisputed as is also the fact that, for many years, prior to the date of the decree in this cause, tenants of the parties under whom Upton claims continuously occupied a portion of said 10,012 acre tract, holding open, notorious and exclusive possession thereof. It is rough mountain land, covered with valuable timber, unsuitable for cultivation, and, therefore susceptible of actual occupation to a limited extent only, without detriment to the timber. William H. Green has resided on it since 1894, under a lease executed to him November 5, 1891, by William Porter, J. B. Walker, J. G. Lyttle and W. A. Walker, and maintained his family, for the most part, by cultivation of the soil. According to his testimony, he erected substantial buildings thereon, cleared about 24 acres of land and cultivated the same. Others had preceded him in the occupation of some of the land, among whom was Mathew Martin, who occupied the premises about 1888, and he was, in turn, succeeded by a man by the name of Shaver. The occupancy of the land has been continuous from about the year 1888. The improvements above mentioned, however, are not on the 1,000 acres claimed by Snyder and others, and the evidence of possession of said tract is very slight. One Thomas Cool·

is said to have erected a shanty on it around which there is a small cleared space, but whether this occupation and improvement was on behalf of any of the claimants of the land, is questioned, there being considerable testimony tending to show that the shanty was erected as a camp for the use of hunters.

The petition and answer of Upton avers that, from the time of the purchase of said tract of land at the tax sale by Cherry, down to the time of filing said petition and answer. the land has been kept on the land books and the taxes thereon paid by himself and those under whom he claims. This is not controverted by the state either in the bill or the amended bill. The state proceeds upon the theory of a forfeiture for non-entry, not in the name of Cherry or any one to whom the claim under the tax deed passed, but upon the theory of a forfeiture for non-entry in the name of Snyder, the tax deed being considered void, in consequence whereof payment of the taxes by one claiming under it, does not, under the doctrine announced in *Simpson* v. *Edmiston.* 23 W. Va. 675, as it has been applied in later decisions, protect the land from forfeiture.

Whatever the defects in the tax deed under which Upton claims, the state is estopped, by section 29 of chapter 31 of the Code, from claiming the Snyder title, which said deed purports to convey, upon any theory, other than the subsequent acquisition thereof from the tax-deed grantee or his successors in title, as by forfeiture, or purchase at a sale for delinquency, though there was a forfeiture in the name of the former owner. Said section makes the tax deed conclusive upon the state that it has passed to the grantee therein the title of the former owner, and she cannot assail it for the purpose of setting up in herself the same title by forfeiture thereof in the name of the former owner for his omission to keep the land taxed in his name and pay the taxes, for a period of five successive years. This statute must release such forfeiture, in advance of the happening thereof, to the grantee in the deed, else that instrument is not conclusive upon the state as the statute says it shall be.

That the legislature has power to make such disposition of a forfeited title is apparent from the provisions of section

39 of Arlicle VI and section 4 of Article XIII of the Constitution of this State, and the principles declared in *Mc-Clure* v. *Maitland*, 24 W. Va. 561, *State* v. *Jackson*, 56 W. Va. 558, *State* v. *Harman*, 57 W. Va. 447, and *State* v. *King*, opinions in which last case are delivered simultaneously with the decision of this case.

Though the state is not mentioned by name in said section, as a person concluded by the tax deed, the principles, declared, and the public policy, manifested, by the Constitution, statutes and decisions, concerning the incidental settlement of land titles in the process of land taxation, the former function being associated with the latter as the exercise of sovereign power in the execution of state policy, it is clear that said section should be construed as including the state. Otherwise, manifest objects of the organic and statutory system of law, dealing with taxation and land titles, would be contradicted and partially defeated. It never was the policy of the state to claim or hold forfeited land titles for the purpose of exacting repeated payments of taxes on the same land, except when necessary to the achievement of just and wise results, nor as against a *bona fide* claimant of the land who had paid the taxes on the same. Acts passed by the General Assembly of Virginia in 1831 and 1835, Code 1849, Acts 1852 and 1857, Code of 1860, and Constitution of 1872, particularly section 3 of Article XIII, protecting actual occupants and tax-payers. A different construction of said section 29 would leave the title of the former owner in the state, in case of a fatal defect in the tax-deed, and failure of the real owner to keep the land taxed and pay the taxes, for no purpose but to exact a double tax on the land, destroy the purchase and render futile the subsequent payment of taxes by the tax-deed purchaser, and allow the derelict owner, at any future time, no matter how remote, to redeem the land, on the filing of a bill by the state to sell it, unless such purchaser could find shelter under section 3 of Article XIII of the Constitution as an actual occupant under color of title, who has paid the taxes on the land for a period of five successive years, and many of them are unable to do that. The injustice of such results, as well as the deviation from long settled principles and policy in adopting a construction of the statute that would make them possible, is shown more

at length in the opinion in *State* v. *West Branch Lumber Company*, delivered simultaneously with this one. In these two cases, the derelict owners came forward, claiming rights of redemption, on the state's bill to sell the lands, without having paid any taxes on them for more than a quarter of a century, notwithstanding the loss of their titles to the state, by forfeiture, long years ago. This right of sale in the state, subject to the statutory right of redemption in the derelict owners, if they exist, would take the lands from persons who honestly bought them and have paid thousands of dollars of taxes on them, in fact all the taxes thereon, accruing to the state, county and districts, since the dates of their purchases. The injustice of such results is sufficiently palpable and flagrant to raise a doubt as to whether the legislature could have intended it, if we view it independently of that steady and persistent policy of punishing, not rewarding, owners of land, derelict and undutiful respecting the taxation thereof, and of favoring, rewarding and protecting those who, under some sort of claim to land, keep the taxes on it paid. This undeviating policy, commenced by the state of Virginia almost, if not quite, a century ago, adhered to until the division of the old state and incorporated into the Constitution and laws of the new state, must be recognized and respected upon the theory as to what the legislature meant in making the tax deed conclusive evidence of title against all persons other than the former owner, his heirs and assigns and those who might have redeemed the land within one year after the sale; and, giving it weight, all doubt is removed. The state is not within the saving. She is not a former owner, nor his heir nor his assign, and could not have redeemed.

The express saving in the statute in favor of the state, counties, districts, school districts and municipal corporations, does not militate against the construction we have given the section. Its object is to enable the state, counties, districts and municipal corporations to enforce their liens for prior taxes. It was inserted for the first time by an act passed in 1887, contemporaneously with an amendment to section 1 of chapter 31, giving a remedy by suit in equity for the enforcement of liens for taxes. The object of such a suit is not to set aside the deed for defects or enforce for-

feitures, prior or subsequent, but to charge the land with prior taxes. It is proceeded against, not as the state's land, but as the land of the tax-deed grantee or former owner, so far as to make it liable for such taxes, as a creditor treats land fraudulently conveyed away as land of the grantor, only for the purpose, and to the extent, of subjecting it to the payment of his debt.

A well settled rule of interpretation is that a statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it was intended to form a part, it being presumed that the legislators who drafted and passed it were familiar with existing law, whether constitutional, statutory or common, and intended it to harmonize completely with the same and aid in effectuating the general purpose and design thereof, if its terms are consistent therewith. *Webb* v. *Ritter*, 60 W. Va. 193, (syl. pts. 5 and 6); *Ross* v. *Reeves* 62 W. Va. 7, (syl. pt. 2).

We do not hold that no forfeiture has accrued under section 6 of Artcile XIII of the Constitution. On the contrary, we adhere to the doctrine of forfeiture in the name of the former owner, but we say the state cannot hold or claim the forfeited title against the tax deed.

On the hearing, the court below dismissed the state's bill, but, on Upton's supplemental petition and answer, and the evidence adduced in support thereof, it adjudged, ordered and decreed that the title to the land was in him. This decree is predicated on the theory of a transfer of the forfeited Snyder title to Upton or some of his predecessors in title, as an eligible transferee in the third class made by section 3 of Article XIII of the Constitution, the tax-deed being regarded as color of title and the question of possession for the requisite period having been litigated between Upton and the Snyders as upon a cross bill and determined in favor of the former. The conclusion at which we have arrived makes this decree clearly right, though the reason assigned differs from that adopted by the court below. We, therefore, affirm it with costs and damages in this Court and costs in the court below to the appellees against all the appellants except the state.

*Affirmed.*