687 S.E.2d 374

**CHARLESTON AREA MEDICAL CENTER, INC., Petitioner Below, Appellant**

v.

**STATE TAX DEPARTMENT OF WEST VIRGINIA, Respondent Below, Appellee.**

No. 34710.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 2009.

Decided Nov. 23, 2009.

Charles O. Lorensen, Esq., George & Lorensen, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr. Esq., Attorney General, Katherine A. Schultz, Esq., Scott Johnson, Esq., Attorney General's Office, Charleston, WV, for Appellee.

PER CURIAM:

Appellant Charleston Area Medical Center, Inc. (hereinafter "CAMC"), appeals from a final decision of the Circuit Court of Kanawha County, West Virginia, affirming the denial of CAMC's Petition for Reassessment, filed with the State Tax Department of West Virginia, Office of Hearings and Appeals. In that petition, CAMC sought to vacate an assessment by the State Tax Commissioner, and sought a refund of that assessment. The circuit court, however, upheld the validity of the assessment concluding that CAMC's provision of in-house health care benefits to certain employees should be considered "gross receipts" for the purposes of the West Virginia Health Care Provider Tax Act of 1993 (hereinafter also referred to as "the

Act"). *See* W. Va.Code § 11–27–1 to –37 (2005 & Supp.2009). Because the circuit court ignored any application of West Virginia Code § 11–27–22(c), which mandates that a health care provider's method of accounting for purposes of the Act be consistent with its accounting methods used for federal income tax purposes, we reverse and remand this case for entry of an Order directing that Appellee State Tax Department of West Virginia refund to CAMC the amounts paid under protest by CAMC after the administrative decision below.[1]

## I. FACTUAL AND PROCEDURAL HISTORY

During the relevant time period, the 1996 and 1997 tax years, CAMC, a non-profit corporation operating hospital facilities in Charleston, West Virginia, provided an optional "self-insurance program" to its approximately 4,500 employees, as well as its retirees.[2] Employees and retirees opting to participate in the program (hereinafter jointly referred to as "covered employees") were eligible to receive health care at both CAMC facilities and other unrelated, or "outside," facilities.[3]

To fund the program, CAMC withheld monthly "premiums" from covered employees' paychecks (retirees made monthly contributions), and deposited the withholdings into a trust fund. CAMC included these premiums in its gross receipts, and thus paid health care provider taxes on those monies. When a covered employee utilized an outside provider, CAMC would pay that provider out of the fund. Covered employees would sometimes also have to pay a deductible or co-pay when using an outside provider, but the fund would cover the balance. CAMC paid the outside providers in cash and then those providers presumably reported those

---

1. There are other errors raised by the Appellant; however, it is not necessary to address these errors due to the Court's decision to reverse based upon the ALJ's failure to apply the mandate of West Virginia Code § 11–27–22(c).

2. CAMC has since changed its self-insurance program and, thus, the question presented in this case is limited to the taxes collected for those years.

3. The self-insurance program was the only type of insurance offered by CAMC to its employees. Consequently, employees opting not to participate in the self-insurance program either obtained insurance on their own, perhaps through a spouse, or had no health insurance at all.

payments as income in their gross receipts for tax purposes.

At issue in this case is the care CAMC provided to its covered employees at its own facilities. Unlike the system used for outside providers, when a covered employee obtained health care at a CAMC facility, no money was withdrawn from the trust fund. Instead, CAMC treated covered employees as a regular patients, recording all aspects of their treatment in the hospital's billing system. Thus, CAMC tracked the charges associated with the covered employee's treatment in the same manner that it would track any other patient's costs, recording the expenses in its billing system.

Unlike other patients, however, CAMC never billed the covered employees or any third party, such as an insurance company, for the charges incurred, nor did it receive any monetary payment for those costs in any other form. Instead, after recording the covered employees' medical costs in the accounting system, CAMC would then make an adjusting entry and remove that amount from the system. Essentially, because CAMC understood that it would never receive any financial remuneration for the care it provided to its covered employees, it removed the value of that care from its "accounts receivable." By removing the amount from the "accounts receivable," CAMC also removed the amount from its taxable "gross receipts," and thus did not pay the health care provider tax on the cost of the health care provided through its health insurance program.

In February 1998, the State Tax Commissioner assessed an additional health care provider tax against CAMC for the period of July 1, 1994, through June 30, 1997, asserting that CAMC was liable for the additional tax based on the accounting entries reflecting the costs associated with health care provided to covered employees. The additional tax for the three years totaled $699,515, which consisted of $537,456 in taxes and $132,059 in interest.

CAMC objected to the assessment, and filed a Petition for Reassessment with the State Tax Commissioner. On December 2, 1999, an administrative law judge (hereafter "ALJ") assigned to the case by the West Virginia State Tax Commissioner's Office of Hearing Appeals, conducted a hearing on the Petition for Reassessment. At that hearing, CAMC presented two witnesses, while the State Tax Commissioner relied solely on the Notice of Assessment. Following additional briefing, the ALJ issued an administrative decision on March 6, 2001, modifying the earlier assessment. Specifically, the ALJ concluded that the portions of the assessment relating to time periods barred by the statute of limitations could not be collected. The ALJ sustained the assessment for the 1996 and 1997 tax periods, however, and ordered CAMC to pay $198,269 in taxes and $56,904.92 in interest.

CAMC paid the amount ordered under protest and, on May 2, 2001, filed a petition appealing that administrative decision to the Circuit Court of Kanawha County, West Virginia. On May 1, 2008, the circuit court entered an order affirming the assessment by the State Tax Commissioner for the 1996 and 1997 tax periods, and dismissing the case.[4]

In affirming the assessment, both the ALJ and the circuit court found that CAMC had received "payment" for the medical services provided to covered employees in the form of services rendered. By statute,[5] a provider's gross receipts are required to include both cash payments and payments "in kind." Both the ALJ and the circuit court reasoned that the provision of the self-insurance program by CAMC was part of the covered employees' compensation and, thus, the employees "paid" for their medical care by performing their duties. Moreover, as the ALJ stated,

[t]he economic advantage of health coverage is a great incentive for a majority of the workers in the job place, who, but for that job benefit, would otherwise not be able to afford such coverage. By providing such a benefit to its employees, CAMC, in return, obtains the continued benefit in

---

4. No explanation is given for the *seven year* delay by the circuit court in issuing this decision.

5. *See, e.g.,* W. Va.Code § 11–27–9(c)(1)(defining "gross receipts").

terms of reduced employee turnover and absenteeism, high productivity and growth of experience in staff level.

Thus, because the ALJ and the circuit court found that CAMC received a benefit for providing medical care to covered employees, they each concluded that the care was paid for "in kind," and such payment should have been included in CAMC's gross receipts. Had they been included in those receipts, the health care provider tax would have applied. Accordingly, each affirmed the assessment for the tax periods not barred by the statute of limitations.

## II. STANDARD OF REVIEW

■ "The same standard set out in the State Administrative Procedures Act, W. Va. Code, 29A–1–1, *et seq.*, is the standard of review applicable to review of the Tax Commissioner's decisions under W. Va.Code, 11–10–10(e) (1986)." Syl. Pt. 3, in part, *Frymier–Halloran v. Paige*, 193 W.Va. 687, 458 S.E.2d 780 (1995). The West Virginia Administrative Procedures Act provides that "an agency action may be set aside if it is '[c]learly wrong in view of the reliable, probative and substantial evidence on the whole record; or ... [a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'" *Id.* at 695, 458 S.E.2d at 788 (*quoting* W. Va.Code § 29A–5–4(g)(5) and –4(g)(6)(1964)). "The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume the agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." *Id.*

■ "However, the clearly erroneous rule does not protect findings made on the basis of incorrect legal standards." *Frymier–Halloran*, 193 W.Va. at 695 n. 13, 458 S.E.2d at 788 n. 13. As always "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrys-*

*tal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). Thus, "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4[ ] and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong." Syl. Pt. 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

## III. DISCUSSION

### a. Background

■ The West Virginia Health Care Provider Tax Act of 1993 imposes a series of annual broad-based taxes on a variety of services rendered by health care providers. The purpose of this tax is to assist the State of West Virginia (hereinafter "the State") in raising its share of funds necessary to draw down federal matching funds for Medicaid. W. Va.Code § 11–27–1. To that end, the Act is designed to conform with a federal statute that "places limitations and restrictions on the flexibility states have to raise state share for its medical assistance program." *Id.* at § 11–27–1(f).

Under the Act, health care providers are taxed, at varying rates, for the privilege of providing sixteen separate types of health care services.[6] *Id.* at § 11–27–4 to –19. As an example, for providing inpatient hospital services, CAMC is taxed at "two and one-half percent of the *gross receipts* derived by the taxpayer from furnishing inpatient hospital services in this state." *Id.* at § 11–27–9(b) (emphasis added). While the tax rates vary for the different categories of services, the tax is always based on the provider's "gross receipts" from furnishing that service. *Id.* at §§ 11–27–4 to –19.

Each tax category defines "gross receipts" as:

*the amount received or receivable, whether in cash or in kind, from patients, third-party payors and others for ... [particu-*

---

6. During the time period at issue in this case, CAMC reported and paid health care provider taxes on its provision of five types of health services: (1) ambulatory surgical centers, (2) emergency ambulance services, (3) inpatient hospital services, (4) physicians' services, and (5) therapists' services.

*lar health] services furnished by the provider,* including retroactive adjustments under reimbursement agreements with third-party payors, without any deduction for any expenses of any kind: Provided, That accrual basis providers shall be allowed to reduce gross receipts by their contractual allowances, to the extent such allowances are included therein, and by bad debts, to the extent the amount of such bad debts was previously included in gross receipts upon which the tax imposed by this section was paid.

*See, e.g.,* § 11–27–9(c)(1) (emphasis added). Thus, the tax is based on the "gross receipts" for a particular service, and gross receipts include the accounts received or receivable for the provision of that service. *Id.* Importantly, the receivables include payments in cash or "in kind." *Id.*

In this case, the State Tax Commissioner levied an additional assessment on CAMC, taxing the cost of the care that CAMC provided to its covered employees, which the State Tax Commissioner believed constituted "receivables" and thus should have been included in CAMC's "gross receipts." In assessing the additional tax, the State Tax Commissioner concluded that CAMC received the services of its covered employees in exchange for the payments otherwise due for the health services provided to them. Because this exchange is payment "in kind" for those services, and because gross receipts include "in kind" payments, the State Tax Commissioner contends that the cost of the care provided should be included in the gross receipts.

CAMC disputes the State Tax Commissioner's contention that the cost of the care it provided to its covered employees constituted an "accounts receivable," and points out that it never billed any party for those costs, nor did it ever receive, or expect to receive,

remuneration for them.[7] Although CAMC tracked the costs through entries[8] in its accounting system, CAMC contends that those entries were never intended to be part of its gross receipts. To the contrary, according to CAMC, the method used relative to its covered employees was purely for tracking purposes, not billing purposes. CAMC argues that its method of accounting is supported by the generally accepted accounting principals, and it points out that it does not report the costs of the health care provided to its covered employees as gross receipts on its federal income tax forms.

CAMC additionally points out that not all of its employees opted into the self-insurance program, and that those not in the program did not receive additional compensation in any other form. Similarly, an employee was expected to work the same number of hours and perform the same duties, regardless of whether he or she opted into the self-insurance program. Thus, CAMC argues that the State Tax Commissioner failed to present any evidence that CAMC obtained a greater benefit from covered employees then from employees who did not participate in the self-insurance program.

Along those same lines, CAMC notes that although it provided coverage to all employees participating in the self-insurance plan, not all of those covered employees actually partook of the health care services offered by CAMC, while others used a substantial amount of care. Thus, CAMC contends, the value of the services rendered to a covered employee bore no relation to any benefit CAMC gleaned through the alleged "in kind" payment.

#### b. Accounting Method

■ The reason for this Court's reversal of the circuit court stems from the failure of

---

7. The State Tax Commissioner contends that no health care is free, even when it is rendered by a health care provider to its employees. Thus, he argues, CAMC must have recouped the costs of such care somewhere, likely by passing the cost on to its employees in the form of reduced wages; the fact that CAMC recouped its expenses in ways more subtle than through cash payments does not mean it should be exempt from paying taxes on that remuneration.

8. Contrary to CAMC's contention that the entries were not "accounts receivable," in the hearing before the ALJ, CAMC's expert witness in the field of health care accounting, Charles Gibbs, in explaining the accounting method used by CAMC referred to these entries as "accounts receivable."

both the ALJ and the circuit court to properly apply the provisions of West Virginia Code § 11–27–22(c). That statute requires "accounting consistency" in the methods of accounting used in calculating health care provider taxes and federal income taxes. Specifically, West Virginia Code § 11–27–22(c), provides, in relevant part, that "[a] taxpayer's method of accounting under this article *shall* be the same as taxpayer's method of accounting for federal income tax purposes." *Id.* (emphasis added). Undisputedly, CAMC did not report the "accounting entries" reflecting the costs associated with the health care it provided to its covered employees through its self insurance program as "gross receipts" for federal income tax purposes. Thus, CAMC argues that by requiring it to report those costs in its gross receipts for purposes of the health care provider tax, the State Tax Commissioner, in effect, is requiring that CAMC use a different method of accounting than it uses for calculating its federal income tax, which directly contradicts the plain language of the statute.

In considering this issue, the ALJ acknowledged in his decision that West Virginia Code § 11–27–22(c) requires consistency in the accounting methods. Yet, the ALJ refused to apply the clear statutory directive, finding it inconsistent with other aspects of the statute. The ALJ states in his decision, which was affirmed by the circuit court: [9]

> While it is true that W. Va.Code § 11–27–22(c) requires that health care providers follow the same method of accounting on their West Virginia returns as that adopted on their federal income tax returns, the provision does not permit the departure from yet another mandatory provision of the statute imposing the very tax. That provision, in each case, states that "[T]he [sic] tax imposed in subsection (a) of this section shall be ... percent of the *gross* receipts derived by the taxpayer from furnishing (health care) services in this state."
>
> . . .

Obviously, the mandatory provisions imposing the tax measured by *gross* receipts should in all cases supersede any other provision, mandatory that it may be, setting forth the mere accounting method used as a *starting point* for determining taxable income.

(internal citations omitted).

 In reviewing any statute, it is well-established in West Virginia that

> "[a] statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith." Syllabus Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908).

Syl. Pt. 3, *Joslin v. Mitchell*, 213 W.Va. 771, 777, 584 S.E.2d 913, 919 (2003).

> In deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995). *See also* Syl. pt. 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("[w]here the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); Syl. pt. 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

*Davis Mem'l Hosp. v. West Virginia State Tax Comm'r*, 222 W.Va. 677, 682, 671 S.E.2d 682, 687 (2008).

9. The circuit court's Order did not specifically address this matter; however, it did affirm the ALJ's decision regarding the issue.

■ There has been no issue raised concerning any ambiguity found within the provisions of West Virginia Code § 11–27–22(c). Moreover, a plain reading of that statutory provision indicates that it clearly and unambiguously provides, in relevant part, that "[a] taxpayer's method of accounting under this article *shall* be the same as taxpayer's method of accounting for federal income tax purposes." *Id.* (emphasis added). As this Court has previously held, "[t]he word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the legislature, should be afforded a mandatory connotation." Syl. Pt. 2, *Terry v. Sencindiver,* 153 W.Va. 651, 171 S.E.2d 480 (1969); *accord Clower v. West Virginia Dept. of Motor Vehicles,* 223 W.Va. 535, 544, n. 8, 678 S.E.2d 41, 50 n. 8 (2009)("The Legislature's use of the word 'shall' . . . is given the mandatory meaning of that term.").

Despite the mandatory meaning of the term "shall" in West Virginia Code § 11–27–22(c), the ALJ determined that the provisions of West Virginia Code § 11–27–4(b), which provides that "[t]he tax imposed in subsection (a) of this section shall be one and three-fourths percent of the gross receipts derived by the taxpayer from furnishing ambulatory surgical center services in this state[,]"[10] "supersede[d] any other provision," including "the mere accounting method" set forth in West Virginia Code § 11–27–22(c).

Let there be no mistake that absent from the Act is any express language by the Legislature that it intended anything other than the mandatory meaning set forth in West Virginia § 11–27–22(c), which clearly provides that a taxpayer's accounting method for the purposes of the health care provider tax "*shall* be the same as the taxpayer's method of accounting for federal income tax purposes." *Id.* (emphasis added). In other words, there is no indication that the other statutory provisions establishing the rate and

measure of the tax imposed, which were relied upon by the ALJ, superseded, changed, or otherwise altered a taxpayer's accounting method.

To the contrary, by mandating accounting consistency between state and federal taxes, the Legislature, in enacting West Virginia Code § 11–27–22(c), sought to assist taxpayers in maintaining consistency in their record keeping and, in so doing, prevent the significant burden on the taxpayer that having to keep multiple sets of books and to apply multiple accounting methods would impose. The ALJ, and ultimately the circuit court, however, simply ignored the clear and unambiguous statutory provision established in West Virginia Code § 11–27–22(c).

Because of this action, the ALJ and ultimately the circuit court assessed additional health care provider taxes because of a decision mandating CAMC to deviate from the accounting method it uses for federal tax purposes. This is clear given that for federal tax purposes, CAMC did not include accounting entries associated with the self-insurance benefits in its gross receipts, while the ALJ required those same entries, which reflect non-cash items, to be included in gross receipts for the health care provider tax. This was erroneous and violated the provisions of West Virginia Code § 11–27–22(c).

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that the circuit court erred in denying CAMC's petition for reassessment of the additional health care provider tax and interest at issue in this case. Consequently, the Court reverses the final order of the Circuit Court of Kanawha County and remands this case for entry of an Order directing that Appellee State Tax Department of West Virginia refund to CAMC the amounts paid

10. *See, e.g.,* W. Va.Code § 11–27–4(b)(setting forth similar rate and measure of tax language relative to ambulatory surgical centers); W. Va. Code § 11–27–7(b)(setting forth similar rate and measure of tax language relative to emergency ambulance service); W. Va.Code § 11–27–9(b)(setting forth similar rate and measure of tax

language relative to inpatient hospital services); W. Va.Code § 11–27–16(b)(setting forth similar rate and measure of tax language relative to physicians' services); and W. Va.Code § 11–27–19(b)(setting forth similar rate and measure of tax language relative to therapists' services).

599

under protest by CAMC after the administrative decision below.

Reversed and remanded.

Justice McHUGH, having been disqualified, did not participate in the decision of this case.

Judge SWOPE sitting by temporary assignment.