700 S.E.2d 805

**The SHEPHERDSTOWN OBSERVER, INC., Plaintiff Below, Appellant**

v.

**Jennifer MAGHAN, Clerk of the County Commission of Jefferson County, Defendant Below, Appellee.**

**No. 35446.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 8, 2010.

Decided Sept. 23, 2010.

Stephen G. Skinner, Esq., Skinner Law Firm, Charles Town, WV, Patrick McGinley, Esq., Morgantown, WV, for Appellant.

Stephanie F. Grove, Esq., Assistant Prosecuting Attorney, Charles Town, WV, for Appellee.

Joseph G. Thompson, Harpers Ferry, WV, Amicus Curiae.

Troy N. Giatras, Esq., The Giatras Law Firm, PLLC, Charleston, WV, for Amici The Reporters Committee for Freedom of the Press and the Society of Professional Journalists.

KETCHUM, J.:

The Shepherdstown Observer (hereafter "the Observer") appeals an order of the Circuit Court of Jefferson County dismissing its civil complaint against Jennifer Maghan, in her capacity as the Clerk of the County Commission of Jefferson County ("County Clerk" or "Clerk"). For the reasons set forth herein, we reverse the Circuit Court of Jefferson County and remand this matter for further proceedings consistent with this opinion.

## I. Factual Background

In October of 2008, the County Commission of Jefferson County passed a traditional zoning ordinance, which was intended to replace the County's non-traditional zoning ordinance.[1] Shortly thereafter, a citizen group opposed to the new zoning ordinance organized a petition drive and gathered signatures to force a ballot referendum on the ordinance pursuant to the provisions of *W.Va.Code*, 8A–7–13(j)[2008].[2] The organizers hoped that the voters would nullify the new ordinance. The petition seeking a referendum was filed with the County Clerk's office, at which time the Clerk canvassed the signatures on the petition and determined that it contained more than the requisite number of signatures of eligible voters needed to require a ballot referendum on the new ordinance. Upon making this determination, the Clerk issued a "Certification of Valid and Invalid signatures on the Zoning Petition 2008" and the County Commission's new zoning ordinance was placed on the ballot.[3]

---

1. *W.Va.Code*, 8A–1–2(t) [2004] defines a non-traditional zoning ordinance as follows:

   "Non-traditional zoning ordinance" means an ordinance that sets forth development standards and approval processes for land uses within the jurisdiction, but does not necessarily divide the jurisdiction into distinct zoning classifications or districts requiring strict separation of different uses, and does not require a zoning map amendment.

2. *W.Va.Code*, 8A–7–13(j) [2008], in part, provides as follows:

   If a governing body of a county chooses to replace a nontraditional zoning ordinance with a traditional zoning ordinance without holding an election, a petition, signed by at least ten percent of the eligible voters who reside in the area affected by the zoning ordinance, for an election on the question of adopting a traditional zoning ordinance may be filed with the governing body of the county within ninety days after the enactment of the traditional zoning ordinance by the governing body of the county. If a petition is timely filed, then the

traditional zoning ordinance does not take effect until:

   (1) Notice of the election and the zoning ordinance is published in a local newspaper of general circulation in the area affected by the zoning ordinance, as a Class II–0 legal advertisement, in accordance with the provisions of article three [§§ 59–3–1, *et seq.*], chapter fifty-nine of this code;

   (2) An election is held; and

   (3) A majority of the voters approve it.

3. *W.Va.Code*, 8A–7–7(c)[2008] provides as follows:

   If a petition for an election on a zoning ordinance is filed with the clerk of a governing body within ninety days after the enactment of a zoning ordinance by a governing body without an election, then a zoning ordinance does not take effect until an election is held and a majority of the voters approves it. At least ten percent of the total eligible voters in the area to be affected by the proposed zoning ordinance must sign, in their own handwriting, the petition for an election on a zoning ordinance.

After the petition had been filed, the Observer submitted a Freedom of Information Act ("FOIA" or "Act") request to the County Clerk. In its request, the Observer sought copies of all certification documents for the then-proposed zoning referendum, including the petition [4] and the signatures thereon. An Assistant Prosecuting Attorney for Jefferson County replied to the Observer's FOIA request, informing the Observer that the referendum petition containing the voter signatures was not a public record and, therefore, not subject to release under the Freedom of Information Act. The Assistant Prosecutor further explained that under the Act:

A public record is defined as 'any writing containing information in relation to the conduct of the public's business, *prepared,* owned and retained by a public body.' Obviously, the petition was not prepared by the County Commission, nor was it prepared on behalf of the County Commission[.] (Emphasis in original).

Following the Clerk's refusal to provide the petition, the Observer filed a civil action against the Clerk in the Circuit Court of Jefferson County seeking to compel disclosure of the referendum petition. The Clerk moved to dismiss the complaint pursuant to Rule 12(b)(6) of the *West Virginia Rules of Civil Procedure,* arguing that the petition was not a public record subject to disclosure under the West Virginia Freedom of Information Act. While the Observer's civil action was being litigated, a referendum vote was held on the zoning ordinance, and a majority of the county's citizens voted to reject the new ordinance.

Following briefing and argument, the circuit court granted the Clerk's motion to dismiss the complaint, finding that the referendum petition was not a public record within the meaning of the Freedom of Information Act. The circuit court concluded that the Act only requires disclosure of writings "prepared, owned and retained by a public body,"

*W.Va.Code,* 29B–1–2(4)[1977], and because the petition (and signatures thereon) sought by the Observer was not prepared by the Clerk's office, it was not a public record within the meaning of the Act. The circuit court further concluded, citing our decision in *State ex rel. Daily Gazette Company v. Bailey,* 152 W.Va. 521, 164 S.E.2d 414 (1968), that: (1) the individuals signing the petition were entitled to secrecy; (2) disclosing the names of signatories on the petition could have a chilling effect on the ability of citizens to petition the government; and (3) there was no valid purpose in making the signatures public.

The Observer now appeals the circuit court's order. The Observer argues that the circuit court's conclusion that a public record must not only relate to the public's business, but also must have been a record that was created by the public body in the first instance, is an overly restrictive interpretation of what constitutes a public record subject to disclosure under our Freedom of Information Act. The Observer further argues that the circuit court erred in concluding that a petition to force a referendum on a county zoning ordinance is analogous to a secret ballot and, therefore, constitutionally protected from public disclosure.

In response, the Clerk argues that the definition of what constitutes a "public record" for purposes of a FOIA request is clear and unambiguous and that the circuit court was correct in finding that FOIA applies only to writings prepared, owned and retained by a public body. The Clerk further argues that the circuit court was correct in finding that disclosing the identities of the signatories on the petition would have a chilling effect on the ability of citizens to petition the government.

## II. Standard of Review

■ "Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*" Syllabus Point 2, *State ex*

---

4. The record indicates that several petition signature sheets were circulated in the petition drive and submitted to the County Clerk's office at various intervals. Reference in this Opinion to "petition" includes all signature sheets and other signature documents reflected in the County Clerk's "Certification of Valid and Invalid Signatures on the Zoning Petition 2008." The record before us shows this tally to be 3,463 valid signatures and 796 invalid signatures, for a total of 4,259 signatures.

*rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995).

## III. Discussion

There are two distinct categories of issues presented by this appeal. The first category relates to the interpretation and application of our state Freedom of Information Act, *W.Va.Code*, 29B–1–1, *et seq.* The second category relates to the constitutional issues of whether the signatures on a zoning referendum petition are tantamount to a secret ballot, whether the release of those signatures would have a "chilling effect" on the freedom to petition the government, and whether a valid public purpose exists for the disclosure of referendum petitions under our Freedom of Information Act.

### Freedom of Information Act

The arguments relevant to the Freedom of Information Act require us to address two separate issues. First, we must determine whether a "public record," as that term is applied in the Act, includes writings in the possession of a public body that were not actually prepared by, on behalf of, or at the request of, the public body. Second, we must determine whether a referendum petition, including the signatures appearing thereon, are a "public record" subject to disclosure under the Act.

West Virginia's Freedom of Information Act mandates that "[e]very person has a right to inspect or copy any public record of a public body in this State, except as otherwise expressly provided by section four [§ 29B–1–4] of this article," *W.Va.Code*, 29B–1–3(1) [1992]. The Clerk argues that the Act applies only to writings "prepared, owned and retained" by a public body—in this appeal, the public body being the County Clerk's office. In support of that argument, the Clerk relies on the Act's definition of a "public record" [5] as set forth in *W.Va.Code*, 29B–1–2(4) [1977], which reads as follows (with emphasis added):

"Public record" *includes* any writing containing information relating to the conduct of the public's business, prepared, owned and retained by a public body.

Conversely, the Observer argues that the Clerk has failed to give effect to the Legislature's use of the word "includes" in its definition of what shall be deemed a "public record" for purposes of a FOIA request.

In resolving issues pertaining to the meaning to be ascribed to words used in a statute, we have previously noted that "[i]t is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used." *West Virginia Health Care Cost Review Authority v. Boone Memorial Hospital*, 196 W.Va. 326, 338, 472 S.E.2d 411, 423 (1996) (citations omitted). Similarly, we have held that "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syllabus Point 1, *Miners in General Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), overruled on other grounds by *Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982). We have further held that when interpreting statutory language, we must ascribe a meaning that accords with the spirit, purpose and object of the law in issue.

A statute should be so read and applied as to make it accord with the spirit, purposes, and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law applicable to the subject matter, whether constitutional, statutory, or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purpose and design thereof, if its terms are consistent therewith.

Syllabus Point 5, *State v. Snyder*, 64 W.Va. 659, 63 S.E. 385 (1908). *See also Davis Memorial Hospital v. West Virginia State*

---

**5.** As used in this opinion, the phrase "definition of a 'public record' " refers to *W.Va.Code*, 29B–1– 2(4) [1977].

*Tax Commissioner,* 222 W.Va. 677, 671 S.E.2d 682 (2008).

The "spirit, purposes, and objects of the general system" of our Freedom of Information Act was clearly stated by the Legislature in *W.Va.Code,* 29B–1–1 [1977]:

> Pursuant to the fundamental philosophy of the American constitutional form of representative government which holds to the principle that government is the servant of the people, and not the master of them, it is hereby declared to be the public policy of the state of West Virginia that all persons are, unless otherwise expressly provided by law, entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and employees. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments of government they have created. To that end, the provisions of this article shall be liberally construed with the view of carrying out the above declaration of public policy.

In addition to setting forth a clear statement of the public policy behind the Act, the Legislature also guided us in how to interpret disputes arising under that Act when it mandated that "the provisions of this article shall be liberally construed with the view of carrying out the above declaration of public policy." *W.Va.Code,* 29B–1–1. We recognized this mandate of liberal construction in Syllabus Point 4, *Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799 (1985), where we held that:

> The disclosure provisions of this State's Freedom of Information Act, *W.Va.Code,* 29B–1–1 *et seq.,* as amended, are to be liberally construed, and the exemptions to such Act are to be strictly construed. *W.Va.Code,* 29B–1–1 [1977].

█ Having fully considered the record, briefs and arguments of the parties, and our precedent, we find that the Legislature's use of the word "includes" in its definition of a "public record," *W.Va.Code,* 29B–1–2(4) [1977], to be a clear indication that the Legislature was giving an illustrative definition, and not an exclusive definition. We have previously recognized that the term "includes" is not exclusive. In *Davis Memorial Hospital,* 222 W.Va. at 684, 671 S.E.2d at 689, we recognized that "[t]he term 'includ[es]' in a statute is to be dealt with as a word of enlargement and this is especially so where ... such word is followed by 'but not limited to' the illustrations given."(Citations omitted). In ascribing a "common, ordinary and accepted meaning," Syllabus Point 1, *Miners in General Group v. Hix, supra,* to the word "includes," we have also considered the meaning accorded that word in other legislative enactments where it has been defined by the Legislature. We discussed one such example of this latter consideration in *Apollo Civic Theatre, Inc. v. State Tax Commissioner,* 223 W.Va. 79, 87, 672 S.E.2d 215, 223 (2008), *citing W.Va.Code,* 11–15–2(9)[2003], where we noted that the Legislature had given the following definition to the word "includes":

> "Includes" and "including," when used in a definition contained in this article, does not exclude other things otherwise within the meaning of the term being defined.

We are also guided by the Legislature's choice of wording used for the other terms it has defined in the Freedom of Information Act. Presently, there are five defined terms in the Act, all contained in *W.Va.Code,* 29B–1–2 [1977].[6] In reviewing these definitions,

---

**6.** *W.Va.Code,* 29B–1–2, emphasis added, in its entirety provides as follows:

As used in this article:

(1) "Custodian" *means* the elected or appointed official charged with administering a public body.

(2) "Person" *includes* any natural person, corporation, partnership, firm or association.

(3) "Public body" *means* every state officer, agency, department, including the executive, legislative and judicial departments, division, bureau, board and commission; every county and city governing body, school district, special district, municipal corporation, and any board, department, commission, council or agency thereof; and any other body which is created by state or local authority or which is primarily funded by the state or local authority.

we note that for two of the definitions the Legislature used the more definite, restrictive word "means" to define a "custodian" in subsection (1) and a "public body" in subsection (3).[7] In stark contrast, the Legislature used the less definite, less restrictive word "includes" to define a "person" in subsection (2), a "public record" in subsection (4) and a "writing" in subsection (5).

To adopt the position of the Clerk, the Legislature's definition of "public record" would need to read: " 'Public record' *means* any writing...." The Clerk's suggested definition of a public record would severely limit the scope of the Act and the right of every person to "inspect or copy any public record of a public body in this state." *W.Va.Code,* 29B–1–3(1) [1992]. It is obvious that the Legislature did not intend such a restrictive interpretation, and meant for the word "includes" to be given its common, ordinary and accepted meaning, which is that of a word of enlargement. *Davis Memorial Hospital,* 222 W.Va. at 684, 671 S.E.2d at 689 ("[t]he term 'includ[es]' in a statute is to be dealt with as a word of enlargement").

■ Accordingly, we hold that under the West Virginia Freedom of Information Act (FOIA), *W.Va.Code,* 29B–1–1, *et seq.,* a "public record" includes any writing in the possession of a public body that relates to the conduct of the public's business which is not specifically exempt from disclosure by *W.Va. Code,* 29B–1–4, even though the writing was not prepared by, on behalf of, or at the request of, the public body.

Having resolved the issue relevant to the word "includes," we next address whether the referendum petition sought by the Observer is subject to disclosure under the Freedom of Information Act. In *Associated*

*Press v. Canterbury,* 224 W.Va. 708, 688 S.E.2d 317 (2009), we discussed in detail when a writing in the possession of a public body is required to be disclosed under the Act. In that appeal we were asked to determine whether e-mails by public officials are "writings" as defined by the Act and whether, if so, the e-mails at issue were a "public record" under the Act. While we found in Syllabus Point 2 of *Associated Press* that "e-mails," as a classification, are a "writing" under the Act, we concluded that the specific e-mails at issue in *Canterbury* were not a "public record" because the e-mails were of a personal nature and did not relate to the conduct of the public's business.

■ Our decision in *Associated Press* sets forth a useful model of the analysis that should be applied by public bodies responding to a FOIA request. This model, succinctly stated, is as follows: A writing in the possession of a public body is a public record required to be disclosed under the Act where the writing relates to the conduct of the public's business and is not specifically exempted from disclosure pursuant to *W.Va. Code,* 29B–1–4. Conversely, a writing in the possession of a public body is not a public record and need not be disclosed under the Act where the writing does not relate to the conduct of the public's business or where the writing is specifically exempt from disclosure pursuant to *W.Va.Code,* 29B–1–4.

■ In the case before us, the Jefferson County Commission voted to replace a nontraditional zoning ordinance with a traditional zoning ordinance. Pursuant to *W.Va. Code,* 8A–7–13(j)[2004], voters within Jefferson County were entitled to organize a petition drive to force a ballot referendum to approve or disapprove the ordinance passed

---

(4) "Public record" *includes* any writing containing information relating to the conduct of the public's business, prepared, owned and retained by a public body.
(5) "Writing" *includes* any books, papers, maps, photographs, cards, tapes, recordings or other documentary materials regardless of physical form or characteristics.

7. Our decision *In re Greg H.,* 208 W.Va. 756, 760, 542 S.E.2d 919, 923 (2000)(Per curiam), made the following observation on the Legislature's use of the word "means" in a statute: "[w]here the

legislature does, however, declare what a particular term 'means,' such definition is ordinarily binding upon the courts and excludes any meaning that is not stated."

In n. 6 of *In re Greg H.,* we also observed that: "[a] term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what the term 'means.' " 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:07, at 231 (6th ed.2000).

by the County Commission. In order to force the referendum, two things were required to occur. First, 10% of the eligible voters residing in the area affected by the ordinance had to sign a petition demanding a referendum. Second, the petition had to be *filed* with the County Clerk within ninety days of the new ordinance being passed by the County Commission.[8] Based on the record before us, both of these conditions were met.

It is clear to this Court that referendum petitions, such as the one before us, are a "writing" as that term is defined by *W.Va. Code*, 29B–1–2(5).[9] It is also clear that such petitions, when filed with a public body, are writings in the possession of a public body. It is equally clear that where such petitions call upon or require the public body to perform an official act, the petitions relate to the conduct of the public business. In the present case, the referendum petition was required to be filed with a public body (here the County Clerk) and, once filed, the petition required the County Commission and County Clerk to perform various official acts. There is no question that the petitions are public records required to be disclosed under our Freedom of Information Act.

■ Accordingly, we find that under the West Virginia Freedom of Information Act, *W.Va.Code*, 29B–1–1, *et seq.*, a referendum petition filed with a public body is a public record required to be disclosed under the Act. The Legislature has mandated that "[e]very person has a right to inspect or copy any public record of a public body in this State, except as otherwise expressly provided by section four [§ 29B–1–4] of this article." *W.Va.Code*, 29B–1–3(1) [1992]. We find no exception which would exempt the petition at issue from disclosure under the Act.

8. *See* note 2, subsection (j), *supra.*

9. *See* note 6, subsection *(5), supra.*

10. We note that our decision in *Bailey* preceded the Legislature's 1977 enactment of the West Virginia Freedom of Information Act. Prior to the enactment of the Freedom of Information Act, the Legislature mandated open records in *W.Va.Code*, 51–4–2 [1923], which provides as follows:

## Constitutional Issue

■ Having resolved the statutory construction issues, we next address the circuit court's finding that the signatures on the referendum petition were tantamount to a secret ballot, that public disclosure of the names on the referendum petition would have a chilling effect on the public's right to petition the government for redress, and that no valid purpose existed for disclosing the referendum petition pursuant to a FOIA request.

In reaching its findings, the circuit court relied on this Court's opinion in *State ex rel. Daily Gazette Co. v. Bailey*, 152 W.Va. 521, 164 S.E.2d 414 (1968). In *Bailey*, we addressed whether certificates of nomination to place a candidate for president and vice-president on the ballot were public records required to be disclosed under our open records statutes.[10] In Syllabus Point 1 of *Bailey*, we concluded that "[c]ertificates of nomination signed and filed pursuant to [state law] do not constitute public records."[11] This conclusion was based on our determination that certificates of nomination were the functional equivalent of the candidate nominating processes used by the major political parties.

The legislature has declared that candidates may be nominated for political office in a manner other than by conventions or primary elections. This declaration has been made in the following words: "(a) Groups of citizens having no party organization may *nominate* candidates for public office otherwise than by conventions or primary elections[.]"

*Bailey*, 152 W.Va. at 524, 164 S.E.2d at 416. A major deciding factor in *Bailey* was the Legislature's mandate that "No person sign-

The records and papers of every court shall be open to the inspection of any person, and the clerk shall, when required, furnish copies thereof, except in cases where it is otherwise specially provided.

11. Syllabus Point 1 of *Bailey* reads as follows:

Certificates of nomination signed and filed pursuant to the provisions of West Virginia Code, 1931, 3–5–23 and 24, as amended, do not constitute public records.

ing such certificate shall vote at any primary election to be held to nominate candidates for office to be voted for at the election to be held next after date of signing such certificate[.]" *Id.* In all aspects, a person signing a nominating certificate was casting a primary ballot for his or her candidate and had thus voted. It was for this reason that we held in Syllabus Point 2 of *Bailey* that: [12]

> [a] qualified voter who signs a certificate ... effectively casts his vote for the nomination of the candidate named therein and his vote, except where necessarily revealed, is entitled to the same secrecy as one cast in a primary election.

The circuit court's conclusion that a referendum petition should be treated, under *Bailey*, as a ballot cast and therefore "entitled to the same secrecy as one cast in [an] election," is misplaced. In *Bailey*, we expressly recognized the distinction between a petition like the one before us and the nominating certificates at issue in *Bailey*.

> These signers were not making a supplication or request to a superior or to a group in authority, as in the connotation of a petition. They were affirmatively making a nomination, which, if done in accordance with the appropriate statute, would succeed in placing their candidate on the ballot in the general election.

*Bailey*, 152 W.Va. at 526, 164 S.E.2d at 417.

As opposed to dealing with secret ballots and nominating certificates, the issue before us is whether disclosure of the petition, and the signatures thereon that requested a ballot referendum, under our Freedom of Information Act would violate the First Amendment to the *United States Constitution* or Article III, §§ 7 [13] and 16 [14] of the *Constitution of West Virginia*.

In *John Doe No. 1 v. Reed*, 561 U.S. ——, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010),[15] the United States Supreme Court addressed this very issue. In *Reed*, the Supreme Court was asked to determine whether the First Amendment rights of signatories to a referendum petition would be violated if a referendum petition, and the signatures contained thereon, were disclosed to the public under Washington State's Public Records Act.

In *Reed*, the state legislature enacted a new law that generated some public opposition.[16] Those opposed to the new law organized a petition drive to force a ballot referendum, where it was hoped the new law would be nullified by the voters. In order to force a ballot referendum, state law required that a petition containing the requisite number of valid signatures be filed in the Washington State Secretary of State's office. Once filed, the Secretary of State would canvas the signatures to assure that each met the elements required in order to be deemed valid (voter's signature, address and county of voter registration) and if the required percentage was met, the law would be placed on the ballot as a voter referendum. The

---

**12.** Syllabus Point 2 of our decision in *Bailey* reads, in its entirety, as follows:

> A qualified voter who signs a certificate in accordance with the provisions of West Virginia Code, 1931, 3–5–23, as amended, effectively casts his vote for the nomination of the candidate named therein and his vote, except where necessarily revealed, is entitled to the same secrecy as one cast in a primary election.

**13.** Article III, Section 7 of the *Constitution of West Virginia* provides as follows:

> No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

**14.** Article III, Section 16 of the *Constitution of West Virginia* provides as follows:

> The right of the people to assemble in a peaceable manner, to consult for the common good, to instruct their representatives, or to apply for redress of grievances, shall be held inviolate.

**15.** We note that the Supreme Court's decision in *Reed* was released after the circuit court entered its order dismissing the case below and, therefore, that the circuit court did not have the benefit of the Supreme Court's opinion in *Reed* when it made its findings of fact and conclusions of law.

**16.** The new law at issue in *Reed* " 'expand[ed] the rights and responsibilities' of state-registered domestic partners, including same-sex domestic partners." *Reed, Id.*, 561 U.S. at ——, 130 S.Ct. at 2816.

process for bringing about a ballot referendum in the state of Washington is virtually identical to that required to force a ballot referendum on a zoning ordinance under *W.Va.Code*, 8A–7–13 [2004].[17]

The issue in *Reed* developed when, after the petition seeking a ballot referendum on the new law had been filed, the Washington Secretary of State received several requests for copies of the referendum petition pursuant to Washington's Public Records Act.[18] Those requesting the copies of the petition had publicly stated that they intended to publish the names online, in a searchable format. Before the Secretary of State acted on the request, the referendum petition organizer and some of the people who had signed the petition filed a complaint seeking injunctive relief to bar release of the petition on the grounds that, *inter alia*, the Public Records Act was unconstitutional as it applied to referendum petitions. A preliminary injunction was granted, but that injunction was subsequently reversed by the United States Court of Appeals for the Ninth Circuit and the Supreme Court granted certiorari.

On certiorari, the Supreme Court found that the "compelled disclosure of signatory information on referendum petitions is subject to review under the First Amendment" because "[e]ven if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered 'by the whole electorate.'" *Reed*, 561 U.S. at ——, 130 S.Ct. at 2817. (Citations omitted). However, the Court went on to determine that "disclosure under the [Public Records Act]

would not violate the First Amendment with respect to referendum petitions in general." *Id.*, 561 U.S. at ——, 130 S.Ct. at 2821. In reaching this conclusion, the Court concluded that "public disclosure of referendum petitions in general is substantially related to the important interest of preserving the integrity of the electoral process." *Id.*, 561 U.S. at ——, 130 S.Ct. at 2820. This interest, the Court noted, "was particularly strong with respect to efforts to root out fraud," although not limited to that interest alone.

> [T]he State's interest in preserving electoral integrity is not limited to combating fraud. That interest extends to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote in the State. That interest also extends more generally to promoting transparency and accountability in the electoral process[.]

*Id.*, 561 U.S. at ——, 130 S.Ct. at 2819. (Citations omitted).[19]

Having fully considered the Supreme Court's decision in *John Doe No. 1 v. Reed*, we see nothing in our state law or state *Constitution* that would bar disclosure of the referendum petition at issue pursuant to a FOIA request.

## IV. Conclusion

Accordingly, we find that disclosure of a referendum petition under the West Virginia Freedom of Information Act serves a vital function in protecting the integrity of the electoral process and in promoting transparency and accountability in the "conduct of the

---

**17.** *See* n.2, *supra*.

**18.** The Washington Supreme Court's summary of Washington's Public Record Act was succinctly stated in *Amren v. City of Kalama*, 131 Wash.2d 25, 929 P.2d 389, 392 (1997) (citations omitted), where the Court observed that:

> This court has found that the [Public Records] Act is a "strongly worded mandate for broad disclosure of public records." Thus, it is to be liberally construed to promote full access to public records, and its exemptions are to be narrowly construed.

**19.** The Court in *Reed* also ruled that those opposing disclosure of the petition under the PRA could continue their "as-applied" challenge

sought in Count II of their lawsuit. An "as-applied" challenge permits a party to seek an exception to, e.g., a law that would require public disclosure of personal information. However, before being entitled to an "as-applied" exception, the party must demonstrate that there is "a reasonable probability that the compelled disclosure of [personal information] will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley v. Valeo*, 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

In the appeal before us, no party sought an "as-applied" exception to bar disclosure of the referendum petition. We need not, therefore, address that portion of the Supreme Court's opinion in *Reed*.

public's business." *W.Va.Code,* 29B–1–2(4) [1977]. We further find that the circuit court erred in holding that signatures on a referendum petition were the functional equivalent of a secret ballot, that disclosing the names of signatories on a referendum petition could have an unconstitutional chilling effect on the ability of citizens to petition the government in violation of the First Amendment to the *United States Constitution* and Article III, §§ 7 and 16 of the *Constitution of West Virginia,* and that no valid purpose existed for making the signatures appearing on a referendum petition public.

For these reasons, we reverse the circuit court's "Order of Dismissal" dated August 21, 2009, and remand this matter with directions that an order be entered requiring the Clerk of the County Commission to provide the Observer the public records sought in its FOIA request.

Reversed and Remanded.